[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 125.]

BYRNES ET AL., APPELLEES, *v*. LCI COMMUNICATIONS HOLDINGS COMPANY ET AL., APPELLANTS.

[Cite as *Byrnes v. LCI Communications Holding Co*., 1996-Ohio-307.]

*Age discrimination—Employment discharge action—Inference that employer was motivated by discriminatory animus to act against employee not possible absent casual connection between employer's discriminatory statements and employee—Discrimination against other employees, standing alone, is insufficient to prove employer also discriminated against plaintiff-employee on basis of age—Establishing primia facie case of age discrimination under R.C. 4112.02 or 4112.14.*

(No. 95-1222—Submitted May 22, 1996—Decided December 11, 1996.)

APPEAL from the Court of Appeals for Franklin County, Nos. 94APE09-1372 and 94APE09-1396.

———————————

{¶ 1} In 1988, Lawrence McLernon, then chief executive officer of defendant-appellant Litel Communications, Inc. ("LCI"; other defendants are affiliated corporations), recruited plaintiff-appellee Thomas J. Byrnes, age forty-eight, to become LCI's president and chief operating officer. In his capacity as president, Byrnes was responsible for the inside operations of LCI and had direct supervision over sales, operations and computer projects.

{¶ 2} McLernon also recruited plaintiff-appellee Richard Otto, age fifty-six. Otto began as a consultant for the company in 1985. In 1987, Otto became a full-time employee and was named vice president. He worked on special projects and reported to McLernon. He was placed in charge of an area designated as "standards and analysis," and he began reporting directly to Byrnes.

**{¶ 3}** In 1990, LCI acquired Charter Network Company ("Charter"), and Otto was responsible for integrating the acquisition. There were problems with the acquisition, and Byrnes received complaints about Otto's performance. As a result, Byrnes gave Otto an unsatisfactory rating for the third quarter of 1990, and he was not given a performance bonus for that period. After the Charter acquisition was completed, Otto was relieved of further responsibility for LCI's acquisitions. Eventually, Byrnes eliminated Otto's position and distributed his duties among other vice presidents. Byrnes told Otto that LCI no longer needed his services. Byrnes testified that his decision to terminate Otto had nothing to do with Otto's age and that he tried to find another position for Otto during the latter half of 1990 but was unable to locate an available position. LCI announced Otto's departure as retirement.

**{¶ 4}** Byrnes also received an unsatisfactory rating for the third quarter of 1990 and did not receive a performance bonus. He failed to meet all his performance objectives for 1990, and LCI failed to meet its budgeted revenues for the year. In early 1991, McLernon terminated Byrnes, age fifty-one. McLernon, who is older than Byrnes, assumed Byrnes's duties.

**{¶ 5}** Otto received severance pay of one year's salary. Byrnes was given a severance package in accordance with the terms of his employment agreement. He returned home to his family in Ireland, where he eventually accepted a position as a university professor at about ten percent of his total 1990 compensation from LCI.

**{¶ 6}** In 1991, Byrnes and Otto filed this action against LCI alleging that they had been discharged on the basis of their age in violation of R.C. 4112.02. At trial, several former LCI employees testified about McLernon's attitude toward older employees. Priscilla Frasher was hired in 1984 as executive secretary for McLernon. Frasher, who was over age fifty when hired, was discharged shortly before her three-month probationary period ended. She testified that she was told

by LCI's chief financial officer, Larry Wolfe, that she had been terminated so that the company could hire a younger person at a lower salary.

**{¶ 7}** Former employee Daniel Lopez testified that during his initial employment interviews in 1989, McLernon said he was displeased with LCI's marketing organization and the only way to turn it around "was to bring in young, aggressive staff managers and change out the old folks." McLernon stated that he "was looking for young risk-takers," and he commented on the youthful marketing departments of LCI's competitors, AT&T and MCI. On another occasion after Lopez had been hired, McLernon favorably commented on Lopez's proposed reorganization of the marketing department because "some of the older folks there could no longer contribute" to the company. Lopez testified that later McLernon referred to an advertising manager as being "essentially over the hill" and "too old to grasp the concepts that he was looking for." McLernon also referred to another terminated employee as being "too old and tired" for this business.

**{¶ 8}** Ed Florek, another former LCI executive, testified about a conversation in 1985 with McLernon about wanting to create a sales associate program to hire very young, inexperienced associates to be teamed with older, more experienced persons to mentor them. McLernon's reasoning was that "[t]hose old farts you hired aren't going to be around forever." Another LCI executive, John Janis, reportedly stated to Florek, "I don't want old marathoners in my sales organization. I want young sprinters."

**{¶ 9}** The only testimony to have possibly created an inference of age discrimination toward *these* plaintiffs came from Byrnes, who testified that, during the problematic period of the Charter acquisition, he met with McLernon, who questioned whether Otto might be suffering from Alzheimer's disease. Thereafter, McLernon repeatedly asked Byrnes what he intended to do about Otto's future with LCI and began nagging him to terminate Otto.

**{¶ 10}** At the close of the plaintiffs' case, the trial judge denied LCI's motions for directed verdicts despite his comment that "98 percent of the evidence in the record doesn't have anything to do with age discrimination." A jury rendered verdicts in favor of Byrnes and Otto and awarded them damages in the form of back pay, front pay, and punitive damages, totaling approximately $7.1 million. LCI filed post-trial motions seeking judgment notwithstanding the verdict, and a new trial or remittitur on the basis that the plaintiffs had not produced sufficient evidence that age had been considered by LCI in terminating Otto or Byrnes. The court denied the motions and also awarded plaintiffs-appellees additional sums for stock rights each would have received but for their terminations, and for attorney fees.

**{¶ 11}** The court of appeals affirmed the trial court in all respects except for its denial of prejudgment interest. The court concluded that the evidence demonstrated a pattern whereby LCI hired older, experienced management employees for their knowledge and experience, then discarded them once their knowledge and experience had been assimilated into the company, a theory which the court of appeals analogized to squeezing the contents from a tube of toothpaste, then throwing the tube away, *i.e.*, the "toothpaste tube" theory of liability. The appellate court then remanded the matter with instructions to grant prejudgment interest.

**{¶ 12}** The cause is now before this court upon the allowance of a discretionary appeal.

_____

*Russell A. Kelm,* for appellees.

*Jones, Day, Reavis & Pogue, Patrick F. McCartan, Glen D. Nager* and *Steven T. Catlett,* for appellants.

*Stewar, Jaffy & Associates Co., L.P.A., Stewart R. Jaffy* and *Marc J. Jaffy,* urging affirmance for *amicus curiae*, Ohio AFL-CIO.

*Murray & Murray Co., L.P.A., Dennis E. Murray, Jr.* and *Patrick G. Warner,* urging affirmance for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Spater, Gittes, Schulte & Kolman, Frederick M. Gittes, Kathaleen B. Schulte* and *Louis A. Jacobs,* urging affirmance for *amici curiae*, Ohio Chapter of the National Organization for Women, 9To5 National Association of Working Women, Police Officers for Equal Rights, Stonewall Union, Ohio Now Education and Legal Fund, National Association for the Advancement of Colored People, Columbus Chapter, the Ohio Civil Rights Coalition, and the Ohio Employment Lawyers Association.

*Betty D. Montgomery,* Attorney General, and *Jeffrey S. Sutton,* State Solicitor, urging reversal on the issue of punitive damages for *amicus curiae,* Ohio Attorney General.

*Jonathan A. Allison,* urging reversal for *amicus curiae*, the Ohio Chamber of Commerce.

———————————

**STRATTON, J.**

**{¶ 13}** The issues presented for review involve the sufficiency of evidence that LCI terminated plaintiffs-appellees on the basis of their age in violation of R.C. 4112.02(N), and the propriety of the damages awarded by the jury. Plaintiffs-appellees contend that evidence of discriminatory remarks demonstrated that a pervasive, discriminatory animus existed at LCI, in particular with Lawrence McLernon, and was sufficient to support a finding of age discrimination. Because we determine that the evidence was not sufficient to support the verdict, we reverse the court of appeals.

**{¶ 14}** R.C. 4112.02 makes it unlawful for an employer to discharge without just cause or otherwise discriminate against a person with respect to any matter related to employment on the basis of age. R.C. 4112.14 (formerly R.C. 4101.17) specifically prohibits an employer from discriminating against a job

applicant or discharging without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job.

{¶ 15} In *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272, this court clarified the methods for establishing a prima facie case of age discrimination under R.C. 4112.14. The methods are the same for R.C. 4112.02, at issue here. Discriminatory intent may be established indirectly by the four-part analysis set forth in *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807, adopted from the standards established in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. The *Barker* analysis requires that the plaintiff-employee demonstrate "(1) that he was a member of the statutorily-protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class." *Id.*, paragraph one of syllabus.

{¶ 16} Discriminatory intent may also be established by direct evidence of age discrimination, which is evidence other than the four-part demonstration of *Barker*. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439. A plaintiff may establish a prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent. *Mauzy*, 75 Ohio St.3d 578, 664 N.E.2d 1272, paragraph one of the syllabus.

{¶ 17} The evidence at trial consisted of remarks by McLernon and other LCI executives as proof of LCI's discriminatory attitude and continuing animus toward older workers. However, none of the remarks, except for the single reference to Alzheimer's disease, had any connection to either of these plaintiffs. There was no link or nexus between the remarks and plaintiffs' discharges that could logically support the inference that the discharges were the result of discriminatory intent. The remarks were distant in time and in fact to plaintiffs'

terminations. Lopez testified as to comments made in 1989, more than one year before these plaintiffs were terminated. Frasher's and Florek's testimony related to comments even more remote, dating back to 1985, years before either Byrnes or Otto became employees of LCI.

{¶ 18} The remarks did not relate to Byrnes and Otto or the decisions to terminate their employment. They related to other persons and positions within the company, specifically an executive secretary and sales and marketing personnel. Otto was a vice president who worked in operations, and Byrnes was a high level executive.

{¶ 19} The isolated statement attributed to McLernon about Alzheimer's disease, a disease which generally afflicts the elderly, refers only to Otto and may best be characterized as inappropriate and insensitive. This single comment by McLernon is insufficient to form the basis of Otto's claim for age discrimination, considering that Byrnes made the final decision to terminate Otto, that Byrnes testified that his decision was not related to Otto's age, and that there is no evidence to the contrary.

{¶ 20} Although the record is replete with testimony of LCI's business woes and tales from former LCI employees, glaringly absent from the record below is evidence which points to age discrimination against *these* plaintiffs, an observation made by the trial judge when he commented at the close of all evidence that "98 percent of the evidence in the record doesn't have anything to do with age discrimination." In fact, there is ample testimony of the failure of performance by both Otto and Byrnes.

{¶ 21} Even plaintiffs-appellees concede that they do not meet the four-part *Barker* analysis. Byrnes was the executive who terminated Otto, who was not replaced. Byrnes himself was then terminated and replaced by McLernon, who was older. Therefore, the fourth prong of the *Barker* analysis was not met, as neither Byrnes nor Otto was replaced by a person outside the statutorily protected class.

**{¶ 22}** Instead, plaintiffs-appellees rely upon evidence in the form of statements by McLernon and other LCI executives over a period of many years to prove discriminatory intent against older workers in general. However, this theory, called the "toothpaste tube" theory by the court of appeals, has no basis in law. The ultimate inquiry in an age discrimination case is whether a plaintiff-employee was discharged on account of age. *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 505, 575 N.E.2d 439, 442. Age-related comments referring directly to the worker may support an inference of age discrimination. However, comments which are isolated, ambiguous or abstract, or made in reference to totally unrelated employee categories cannot support a finding of age discrimination against employees in a wholly different classification. See *Phelps v. Yale Security, Inc.* (C.A.6, 1993), 986 F.2d 1020, 1025. There must be a link or nexus between the discriminatory statement or conduct and the prohibited act of discrimination to establish a violation of the statute. In *Kohmescher,* there was a memorandum which recommended that the plaintiff be selected for Kroger's reduction in workforce because he was "eligible for [the] retirement window." Here, at best, plaintiffs have an isolated comment by McLernon suggesting one of the plaintiffs, Otto, might have Alzheimer's disease. Perhaps McLernon was truly concerned about Otto's status; more likely, he made a joke in poor taste. However insensitive and intemperate these remarks were, they were not tied in time or fact to either Byrnes's or Otto's terminations. Consequently, they are simply insufficient to support the jury's findings that these plaintiffs were discharged on account of their age.

**{¶ 23}** Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee. The mere fact that an employer may have discriminated against other employees, standing alone, is insufficient. The issue is

whether *this* employee was discharged because of his age. The evidence here clearly does not support such a causal link or nexus.

{¶ 24} Therefore, we hold that, in a cause of action for age discrimination under R.C. 4112.02 or 4112.14, when relying upon the direct evidence standard, which is evidence other than the four-part test of *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807, an employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation. The judgment of the court of appeals is reversed. Based upon our finding of insufficient evidence to sustain the verdicts for plaintiffs-appellees, we need not reach the issue of the propriety of damages.

*Judgment reversed.*

MOYER, C.J., and COOK, J., concur.

DOUGLAS and F.E. SWEENEY, JJ., concur in the judgment.

RESNICK and PFEIFER, JJ., dissent separately.

———————————

**DOUGLAS, J., concurring.**

{¶ 25} I concur in the judgment. In doing so, I continue to subscribe to our holding in *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272.

{¶ 26} My concurrence herein is based specifically on the fact that the fourth prong of the test established in *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807, is absent in this case, to wit, that plaintiffs-appellees were not replaced by a person or persons not belonging to the protected class. Plaintiffs-appellees were, in fact, not replaced at all.

{¶ 27} In concurring, I am not unmindful of the "direct evidence" standard as so well set forth in the dissent of Justice Resnick. I believe the standard, where it can be shown to exist, still lives.

F.E. SWEENEY, J., concurs in the foregoing concurring opinion.

_____

**ALICE ROBIE RESNICK, J., dissenting.**

{¶ 28} There is a majority in this case, but no majority *opinion*. The majority consists of five justices who conclude that the decision of the court of appeals should be reversed. The majority, however, is fractionalized and represented by two separate opinions, neither of which has garnered the four votes necessary to establish binding legal precedent as to what the proof requirements are or should be in an action for age discrimination brought under R.C. 4112.02 or 4112.14. Under normal circumstances, I would be apt to conclude that the substance content of such nonmajority opinions is innocuous and regard any direct response thereto as ostentatious. However, I deem it necessary in this case to fully and directly respond to the lead and concurring opinions, despite the fact that neither enjoys majority support. This is because both opinions are ultimately of the same mind regarding the restrictions and limitations to be placed upon the use of circumstantial evidence in an age discrimination case in direct contravention of *Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 664 N.E.2d 1272. Thus, the lead and concurring opinions, albeit separate and without the force of law at present, lie in wait for the next opportunity to join forces and ambush the holding of *Mauzy*.

{¶ 29} The lead opinion derogates *Mauzy* by framing the ultimate issue of age discrimination in terms of a prima facie case and employing causative phraseology to mask what is essentially a direct evidence requirement. When the lead opinion is stripped of its veneer of causative language, all that remains is the singular holding that the plaintiff must either satisfy the four-element indirect test for establishing a prima facie case set forth in *Barker v. Scovill, Inc.* (1983), 6 Ohio St.3d 146, 6 OBR 202, 451 N.E.2d 807, at the syllabus, or produce direct evidence of discrimination in the hornbook sense, *i.e,* evidence that directly proves

10

discrimination without an inference. In the final analysis, these three justices favor a formula under which direct and circumstantial evidence is dichotomized, and which would provide that the only way a plaintiff could prove age discrimination by circumstantial evidence is to satisfy each of the four discrete elements specified in the *Barker* prima facie test.

{¶ 30} The concurring opinion "is based specifically on the fact that the fourth prong of the test established in *Barker* \*\*\* is absent in this case, to wit, that plaintiffs-appellees were not replaced by a person or persons not belonging to the protected class." Thus, the lead and concurring opinions would both hold that *Barker*'s nonstatutory elements must be proved in order to make out a case for age discrimination, despite the existence of other evidence from which a jury may infer age discrimination. Since this is precisely and unequivocally what was rejected in *Mauzy*, and for all the foregoing reasons, I find it imperative to write in defense of *Mauzy*.

{¶ 31} The present action was fully tried on the merits in the trial court. To now frame the issue in terms of whether plaintiffs-appellees, Thomas J. Byrnes and Richard Otto, made out a prima facie case "unnecessarily evade[s] the ultimate question of discrimination *vel non*." *United States Postal Serv. Bd. of Governors v. Aikens* (1983), 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403, 409. The prima facie case is but the first of three stages dealing with the process of allocating the burdens and order of presentation of proof in an age discrimination case. *Barker, supra*; *Kohmescher v. Kroger Co.* (1991), 61 Ohio St.3d 501, 575 N.E.2d 439; *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677-678. Once the paradigm runs its course, each burden thereunder "merges with the ultimate burden of persuading the [jury] that [plaintiffs have been] the victim[s] of intentional discrimination." *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207, 217. At this point, it is no longer relevant how or even whether

plaintiffs succeeded initially in establishing a prima facie case. *Aikens, supra*, 460 U.S. at 715, 103 S.Ct. at 1481-1482, 75 L.Ed.2d at 410.

{¶ 32} The only relevant question at this point is whether the defendant intentionally discriminated against the plaintiffs. Since the jury in the case *sub judice* has answered this question in the affirmative, the issue presented to this court is whether plaintiffs produced sufficient evidence to sustain the jury's finding. This issue should be decided no differently from "disputed questions of fact in other civil litigation." *Aikens, supra*, 460 U.S. at 715-716, 103 S.Ct. at 1482, 75 L.Ed.2d at 410. "[T]rial courts or reviewing courts should [not] treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof,' in deciding this ultimate question." (Citation omitted.) *Id.*, 460 U.S. at 716, 103 S.Ct. at 1482, 75 L.Ed.2d at 411. Thus, it is clearly erroneous to now "focus[] on the question of prima facie case rather than directly on the question of discrimination." *Id.*, 460 U.S. at 717, 103 S.Ct. at 1483, 75 L.Ed.2d at 411.

{¶ 33} On the state of the record, the court should have proceeded directly to the disputed question of whether the plaintiffs presented sufficient evidence to support the jury's finding that Byrnes and Otto were the victims of age discrimination, just as we do when deciding other ultimate questions of fact. There is no reason to allow this case to become mired in a discussion of the elements or alternative methods of proving a prima facie case.

{¶ 34} Also, in evaluating the sufficiency of plaintiffs' evidence, it is essential to understand that in proving discrimination the plaintiff is not required to produce any certain kind of evidence and, in particular, may prove discrimination by circumstantial evidence. The plaintiff "is not limited to presenting evidence of a certain type." *Patterson v. McLean Credit Union* (1989), 491 U.S. 164, 187, 109

S.Ct. 2363, 2378, 105 L.Ed.2d 132, 157.  The high court has clearly and specifically explained:

"As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.  The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves.  Thus, we agree with the Court of Appeals that the District Court should not have required Aikens to submit direct evidence of discriminatory intent.  See *Teamsters v. United States*, 431 U.S. 324, 358, n. 44 [97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429] (1977) ('[T]he *McDonnell Douglas* formula does not require direct proof of discrimination.')." *Aikens, supra*, 460 U.S. at 714, 103 S.Ct. at 1481, 75 L.Ed.2d at 409, fn. 3.

{¶ 35} Thus, it would also be erroneous to require plaintiffs "to submit direct evidence of discriminatory intent" in order to prevail.  *Id*., 460 U.S. at 717, 103 S.Ct. at 1483, 75 L.Ed.2d at 411.

{¶ 36} A proper analysis, therefore, should reflect that the various ageist remarks by Lawrence McLernon constitute circumstantial evidence (in that they require an inference from the statements proved to the conclusion intended) that a discriminatory motive played a part in the challenged employment decisions.  This kind of evidence may support a finding of discrimination irrespective of the McDonnell Douglas formula for establishing a prima facie case.  *Id*., 460 U.S. at 713-714, 103 S.Ct. at 1481, 75 L.Ed.2d 409, fn. 2 and 3.  The only question, if indeed there is one, is whether McLernon's statements were vague, ambiguous or isolated.  See *Cooley v. Carmike Cinemas, Inc.* (C.A.6, 1994), 25 F.3d 1325, 1331; *Phelps v. Yale Security, Inc.* (C.A.6, 1993), 986 F.2d 1020, 1025.  Certainly, they were not isolated.  They were repeated, ongoing for at least five years, and made by a decisionmaker who, the evidence shows, played a part in both of the terminations at issue.  Nor is there anything vague or ambiguous about statements indicative of a desire "to bring in young, aggressive staff managers and change out the old folks," or of a belief that "some of the older folks there could no longer

contribute" to the company, or that a particular employee was "too old to grasp the concepts that he was looking for" or "too old and tired" for the business, or the statement that "I don't want old marathoners in my sales organization. I want young sprinters," to mention a few.

{¶ 37} As the court of appeals aptly observed, these comments reflect "inaccurate notions that middle age equated with lack of energy, loss of memory and deficits in aggressiveness." Such statements, therefore, are indicative of the very type of age-stereotyping that the General Assembly under R.C. 4112.02 and 4112.14 prohibited employers from acting upon. They also reflect an intent to bring such inaccurate notions to bear on employment decisions. McLernon's comments are not expressions of political belief; they are an indication to the world of how he intends to act. In particular, they express a desire to clear out the older employees. The jury should be permitted to draw an inference from this evidence that McLernon's ongoing and deep-rooted bias against older workers had influenced the decisional process at issue, especially since there was additional evidence that LCI had discriminated against other employees because of age. See *Cooley, supra*, 25 F.3d at 1331-1332; *Estes v. Dick Smith Ford, Inc.* (C.A.8, 1988), 856 F.2d 1097, 1102-1103; *Hunter v. Allis-Chalmers Corp.* (C.A.7, 1986), 797 F.2d 1417, 1423.

{¶ 38} Thus, if we treat the issue of discrimination no differently from ultimate questions of fact in other civil litigation, or for that matter in criminal litigation, see *State v. Jenks* (1991), 61 Ohio St. 3d 259, 574 N.E.2d 492, McLernon's comments constitute circumstantial evidence of age discrimination sufficient to support the jury's verdict in this case. This conclusion is inescapable unless some way can be found to artificially limit the plaintiffs to presenting evidence of a certain type and, in particular, to require the plaintiffs to produce direct evidence of discrimination in order to prevail. This is precisely what the lead opinion seeks to accomplish today; and, in so doing, it runs headlong into *Mauzy*.

{¶ 39} The lead begins by revisiting the requirements for and methods of establishing a prima facie case of age discrimination. It observes, on the one hand, that "[d]iscriminatory intent may be established indirect by the four-part analysis set forth in *Barker [supra]*, adopted from the standards established in *McDonnell Douglas Corp. [supra]*." On the other hand, it continues, "[d]iscriminatory intent may also be established by direct evidence of age discrimination which is evidence other than the four-part demonstration of *Barker*." Having thus dichotomized two opposing methods of establishing a prima facie case, the lead opinion concludes that "the fourth prong of the *Barker* analysis was not met, as neither Byrnes nor Otto was replaced by a person outside the statutorily protected class." Thus, plaintiffs must rely "upon the direct evidence standard" for establishing a prima facie case.

{¶ 40} In defining the "direct evidence standard," the lead opinion correctly cites *Mauzy* for the proposition that "[a] plaintiff may establish a prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." However, it then goes on to establish a legal standard of causation which is applicable only "when relying upon the direct evidence standard." Under this standard, a finding of discrimination will be permitted only when the employer's actions or discriminatory statements are aimed at the plaintiff and directed to the very decisional process at issue. The lead opinion will not permit the jury to infer that an illegitimate criterion entered into the decisional process where the plaintiff produces evidence that the very decisionmaker who actively or tacitly participated in the personnel decision at issue made repeated statements reflective of discriminatory animus toward a protected group of which plaintiff is a member. Nor would it allow the jury to draw such an inference from discriminatory comments made about the desirability or work abilities of minority "workers in general," even when those comments are linked to

the actual termination of other minority workers, or even when they reflect an intent to act in accordance therewith.

{¶ 41} Thus, the lead opinion seeks to establish a formula under which the plaintiff must either satisfy the discrete elements specified in *Barker* or proceed under the "direct evidence standard." It then uses causative language to define the "direct evidence standard" in such a way as to preclude it from being satisfied by circumstantial evidence. Indeed, it would take a tremendous amount of naiveté to accept that the requirement that a statement must directly link a decisionmaker's discriminatory animus to the plaintiff and the decision to terminate the plaintiff's employment is not a requirement of "direct evidence" in the hornbook sense, that is, in contrast to circumstantial evidence. Simply, under this formula, the plaintiff must produce hornbook direct evidence of discrimination (as opposed to circumstantial evidence) in order to avoid application of *Barker*'s four-element prima facie test. As a result, under the formula invoked by the lead opinion, the *Barker* prima facie test is the only way that a plaintiff can prove a case of age discrimination by circumstantial evidence.

{¶ 42} This formula, however, is precisely the one rejected in *Mauzy* dressed up in causative attire. In *Mauzy*, the court of appeals created the exact same formula that the lead opinion creates today. As we explained, the court of appeals "agreed with Mauzy that 'the four elements [to establish a prima facie case of age discrimination] set forth in the syllabus of *Kohmescher* *** need not be proven where direct evidence of age discrimination is presented.' The court found, however, that Mauzy failed to present such direct evidence of age discrimination. In so finding, the court relied on the definition of 'direct evidence' as set forth in Black's Law Dictionary (5 Ed.1979) 414: 'Evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact.' The court of appeals then reasoned that '[a]s a result, appellants were required to present a prima facie case of discrimination by proving

16

the four elements set forth in the syllabus of *Kohmescher*.'" *Mauzy, supra*, 75 Ohio St.3d at 581, 664 N.E.2d at 1275.

{¶ 43} In this way, the court of appeals in *Mauzy* interpreted the words "direct evidence" as used in *Kohmescher* in the same way that today's lead opinion has interpreted the "direct evidence standard" which it ascribes to *Mauzy*, *i.e.*, as "amount[ing] to a rendition of a dichotomy between 'direct' and 'circumstantial' evidence." *Mauzy*, 75 Ohio St.3d at 583, 664 N.E.2d at 1277. Additionally, the employer in *Mauzy* argued, as the lead opinion would hold today, that "a plaintiff attempting to produce direct evidence to avoid application of the *McDonnell Douglas* test cannot rely upon the presentation of merely circumstantial evidence." *Id.*, 75 Ohio St.3d at 584, 664 N.E.2d at 1278. Similarly, the dissenting judge in the court of appeals in the case *sub judice*(whose opinion was rendered prior to our decision in Mauzy) argued as did the employer in *Mauzy*:

"While here, there were many instances of insensitive comments with respect to other personnel, there was no direct evidence that age discrimination took place, particularly as it related to appellees. In each of the comments cited by the majority, we can only *infer* that age was the cause for termination. Unlike *Kohmescher*, there is no direct evidence in the instances cited here and, certainly, no direct evidence with respect to appellees.

"*** Clearly, the statements are not direct evidence of age discrimination, as it relates to appellees herein. Appellees should not be able to get around the evidentiary requirements of *Barker* based on inferences created from statements and any attitudes associated with them." (Close, J., dissenting.)

{¶ 44} Our primary and precise focus in *Mauzy* was to reject these notions. We very carefully and clearly explained that "*McDonnell Douglas* is one method, an indirect method involving the process of elimination, whereby the plaintiff may create an inference that an employment decision was more likely than not based on illegal discriminatory criteria. The process of elimination, however, is not the only

method by which such an inference may be created." *Id.*, 75 Ohio St.3d at 584, 664 N.E.2d at 1277. Instead, "the four-element *McDonnell Douglas* prima facie test comes into play '"*absent direct, circumstantial, or statistical evidence of discrimination*."'" (Emphasis *sic*.) *Id.*, 75 Ohio St.3d at 584, 664 N.E.2d at 1278. Thus, "[t]he caliber of evidence as 'direct' *** is [not] the sole alternative method [to the *Barker/McDonnell Douglas* test] by which to create an inference of discrimination." *Id.*, 75 Ohio St.3d at 586, 664 N.E.2d at 1279.

{¶ 45} Accordingly, we held that "[t]he phrase 'Absent direct evidence of age discrimination,' as used in *Kohmescher* ***, refers to a method of proof, not a type of evidence. It means that a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." *Mauzy, supra*, at paragraph one of the syllabus.

{¶ 46} *Mauzy* made clear that there was no limitation placed upon the type of evidence that a plaintiff may produce instead of the *Barker* four-element prima facie test. Only when the plaintiff lacks direct, circumstantial or statistical evidence of discrimination is he or she required to prove the discrete elements specified in *Barker*. Simply stated, the *Barker* test is not the only way for a plaintiff to raise an inference that an employment decision was based on illegal discriminatory criteria. The plaintiff is entitled to prove his or her case by circumstantial evidence of age discrimination outside the confines of *Barker*'s four-element prima facie test.

{¶ 47} Similarly, the concurring opinion "is based specifically on the fact that the fourth prong of the test established in *Barker* *** is absent in this case, to wit, that plaintiffs-appellees were not replaced by a person or persons not belonging to the protected class." However, even if at this late stage of the proceedings we allow the inquiry to become entangled in a discussion of the prima facie case, we cannot require Byrnes and Otto to prove that they were replaced by a person not belonging to the protected class without directly contravening *Mauzy*. The

replacement requirement is not a statutory requirement. Neither R.C. 4112.02 nor 4112.14 imposes any such requirement. Instead, it is imposed as part of a judicially created formulation which "allow[s] the plaintiff to raise an inference of discriminatory intent indirectly [by] serv[ing] to eliminate [one of] the most common nondiscriminatory reasons for the employer's action." *Mauzy, supra*, 75 Ohio St.3d at 583, 664 N.E.2d at 1277. The indelible core principle of *Mauzy* is that where the plaintiff creates an inference "directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent," the *McDonnell Douglas/Barker* prima facie test simply does not come into play. This means that where the plaintiff presents circumstantial evidence of age discrimination other than the *Barker* formulation, as Byrnes and Otto did in this case, none of *Barker*'s nonstatutory elements apply, particularly the requirement that plaintiff prove that he or she was replaced by, or that his or her discharge permitted the retention of, a person not belonging to the protected class. "'As in any lawsuit, the plaintiff may prove his case by direct or circumstantial evidence.'" *Mauzy*, *supra*, 75 Ohio St.3d at 584, 664 N.E.2d at 1278, quoting *Aikens, supra*, 460 U.S. at 714, 103 S.Ct. at 1481, 75 L.Ed 2d at 409, fn. 3.

{¶ 48} The approach advanced in the lead and concurring opinions, therefore, stands in diametric contradiction to our holding in *Mauzy*, as well as to the holdings of the United States Supreme Court, regarding the plaintiff's ultimate evidentiary burden in cases of disparate treatment of individuals. In addition, the lead opinion incorporates a number of erroneous assumptions about what kinds of discriminatory comments made by an employer will suffice to support a finding of discrimination.

{¶ 49} First, it assumes that discriminatory comments about "older workers in general" are insufficient to support an inference of age discrimination. The lead opinion states that "this theory, called the 'toothpaste tube' theory by the court of

appeals, has no basis in law." Instead, it reasons, "[a]ge-related comments referring directly to the worker may support an inference of age discrimination."

{¶ 50} Leaving aside for the moment the lead opinion's characterization of the court of appeals' reference to oral hygiene,[1] comments about "older workers in general" may indeed support an inference of age discrimination. Comments about entire groups or classes in society, particularly when directed at the desirability of employing them and their ability to work, are the very stuff of individual disparate-treatment cases. In fact, even courts which require direct evidence of discrimination to shift the burden of persuasion in a *Price Waterhouse v. Hopkins* (1989), 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, "mixed motives" type of case do not preclude expressions of discriminatory animus from serving this function merely because they are general in nature. Thus, even "[d]irect evidence of discrimination usually entails a general comment about a minority group in society. The courts infer from such a remark that the defendant had discriminatory animus toward the particular plaintiff in the particular job." *Milligan-Jensen v. Michigan Technological Univ.* (D.C.Mich.1991), 767 F.Supp. 1403, 1413, reversed on other grounds (1992), 975 F.2d 302. See, also, *Talley v. Bravo Pitino Restaurant, Ltd.* (C.A.6, 1995), 61 F.3d 1241, 1249; *Stacks v. Southwestern Bell Yellow Pages, Inc.,* (C.A. 8, 1993), 996 F.2d 200, at 202-203; *Linn v. Andover Newton Theological School, Inc.* (C.A.1, 1989), 874 F.2d 1, 3-4; *Sennello v. Res. Life Ins. Co.* (C.A.11, 1989), 872 F.2d 393, 394-395; *Miles v. M.N.C. Corp.*

---

1. The reference to the court of appeals' adoption of a "'toothpaste tube' theory" is misleading and derogatory. By making what is essentially an analogy appear as a colloquial term for a rule of law, the lead opinion is able to slight the court of appeals for establishing a legal rule that purportedly has no basis in law. But, see, *Cooley*, *supra*. The truth is that the court of appeals used the term simply to illustrate the facts of the case as described by the plaintiffs-appellees. The court explained:

"On this appeal, Mr. Otto and Mr. Byrnes assert that they should be permitted to recover if they demonstrate the existence of a pattern of hiring and firing by LCI in which LCI hired older, experienced management employees; acquired the benefit of their knowledge and experience; and then discarded the employees once their knowledge and experience had been assimilated into the company. *The analogy used is to buying a full tube of toothpaste, squeezing the contents from the tube, then throwing the tube away once the tube has served its purpose*." (Emphasis added.)

(C.A.11, 1985), 750 F.2d 867, 874, 876. Even a cursory review of these cases reveals a myriad of comments which clearly support an inference of discrimination, despite the fact that they do not refer directly to the plaintiff-worker.

{¶ 51} Second, the lead opinion concludes that comments which are "made in reference to totally unrelated employee categories cannot support a finding of age discrimination against employees in a wholly different classification." In this regard, it explains that "[t]he remarks did not relate to Byrnes and Otto or the decisions to terminate their employment. They related to other persons and positions within the company, specifically an executive secretary and sales and marketing personnel."

{¶ 52} The underlying assumption here is that discriminatory statements must directly relate to the challenged employment decision in order to support a finding of discrimination. Thus, in the absence of a direct relationship between the employer's ageist remarks and the decisional process at issue, an inference of discrimination is impermissible. In *Radabaugh v. Zip Feed Mills, Inc.* (C.A.8, 1993), 997 F.2d 444, 449, the court explained:

"We do not believe corporate planning documents that set forth a company's overall direction and that demonstrate that a decisionmaker considers youth a positive factor (and, by inference, age a negative factor) can fairly be characterized as 'stray remarks,' *even if the documents do not directly relate to the challenged employment decision*." (Emphasis added.)

{¶ 53} In *Cooley, supra*, 25 F.3d at 1331, the court, in considering two ageist comments made by the employer outside the employment context about older people in general, stated that "[a]lthough those two quoted comments *were not made in the context of [plaintiff's] termination, *** they do help to reveal [the decisionmaker's] state of mind and reflect a deep-rooted, ongoing pattern that is anything but isolated." (Emphasis added.)

**{¶ 54}** Similarly, in *Stacks v. Southwestern Bell Yellow Pages, Inc.* (C.A.8, 1994), 27 F.3d 1316, 1324, the court explained that:

"'Not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision.' *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir.1993). Hudson's comment that 'women were the worst thing' that had happened to the company, however, warrants such an inference, *even though it was not made during the decisional process*." (Emphasis added.)

**{¶ 55}** Thus, an inference of discrimination with regard to a particular employment decision is permissible from general discriminatory comments, despite the fact that the comments "do not directly relate to the challenged employment decision," "were not made in the context of [plaintiff's] termination," or were "not made during the decisional process" at issue. Accordingly, the fact that McLernon's "remarks did not relate to Byrnes and Otto or the decisions to terminate their employment" does not preclude an inference of age discrimination.

**{¶ 56}** Moreover, McLernon's comments, while perhaps made in reference to employees other than a vice president and a high level executive, nevertheless reflect, as the court of appeals stated, "inaccurate notions that middle age equated with lack of energy, loss of memory and deficits in aggressiveness." Also, as previously noted, McLernon's comments reflect an intent to act against older employees. I cannot agree that McLernon's statements can only be construed as though he intended them to mean that he would discriminate on the basis of age only as to particular classifications of employees. It was perfectly reasonable for the jury to infer from these statements that McLernon's discriminatory motives carried over to other employment decisions and to other categories and classes of employees. Thus, the issue of whether McLernon's discriminatory state of mind was compartmentalized according to employee classifications was one of fact, which the jury resolved.

**{¶ 57}** Additionally, I have some very serious reservations about endorsing any general rule that allows an employer to compartmentalize its discriminatory remarks when they prove to be disadvantageous to the employer's subsequent litigation posture. See *Lockhart v. Westinghouse Credit Corp.* (C.A.3, 1989), 879 F.2d 43, 54. There is no more reason to think that an employer's discriminatory attitudes necessarily differ from one group of employees to another than "[t]here is *** reason to think those attitudes differ from hiring to promotion." *Equal Emp. Opportunity Comm. v. Alton Packaging Corp.* (C.A.11, 1990), 901 F.2d 920, 924, fn. 6. If we allow the employer to pigeonhole its discriminatory statements in this manner, we in effect remove the ultimate question of discrimination from the province of the jury and hand it over to one of the parties.

**{¶ 58}** In its third error concerning what kinds of discriminatory comments are sufficient, the lead opinion implicitly concludes that the temporal remoteness of discriminatory comments should, of itself, bar any inference that the bias expressed thereby entered into the decisional process. It explains as follows:

"The remarks [attributable to McLernon and other LCI executives] were distant in time *** to plaintiffs' terminations. Lopez testified as to comments made in 1989, more than one year before these plaintiffs were terminated. Frasher's and Florek's testimony related to comments even more remote, dating back to 1985, years before either Byrnes or Otto became employees of LCI."

**{¶ 59}** Discrimination law is "[l]ike the common law of torts," in part because legal liability is conditioned "on a determination that the consideration of an illegitimate factor *caused* a tangible employment injury of some kind." (Emphasis *sic*.) *Price Waterhouse, supra*, 490 U.S. at 264-265, 109 S.Ct. at 1798, 104 L.Ed.2d at 297 (O'Connor, J., concurring). Under common-law tort principles, temporal remoteness is not a bar to a finding of causal connection. See Prosser & Keeton on Torts (5 Ed.1984) 283, Section 43; 2 Restatement of the Law 2d, Torts (1965) 434, Section 433, Comment *f*.

**{¶ 60}** This principle has special force when applied in the context of evaluating expressions of discriminatory animus in an action for disparate treatment of an individual. This is because discriminatory animus does not necessarily dissipate after the lapse of some arbitrarily imposed period of time. As explained in *Wilson v. Aliceville* (C.A.11, 1986), 779 F.2d 631, 635, quoting the trial court:

"'Presumably, people don't pick up a racially prejudiced attitude overnight. The jury is entitled to consider that later than 1982, he [the decisionmaker] was referring to the plaintiff as a "goddam nigger." He felt that way about him when he wouldn't hire him. It's a jury question. And it's not too remote. In fact, I think I would have to oblige myself to human nature to agree with you.

"'If the man is prejudiced in late 1982, it's almost certain he was in early 1982. Now, if he was unprejudiced in late 1982, he might have learned something in the meantime. But people don't usually pick up racial prejudice overnight.

"'And if they have got it in late 1982, it is almost certain they had it in early 1982. At least the jury can so consider, and they have the right to consider it in the light of human experience. And that has been my human experience.'"

**{¶ 61}** Thus, as the court in *Riordan v. Kempiners* (C.A.7, 1987), 831 F.2d 690, 698-699, pointedly explained:

"Proximity in time to the alleged discrimination is a proper consideration in assessing probative value; but given the importance of circumstantial evidence in proving (and, equally, disproving) employment discrimination, a blanket exclusion of evidence of events that occurred before or after the discrimination is arbitrary."

**{¶ 62}** In the case *sub judice*, Priscilla Frasher, Daniel Lopez and Ed Florek testified as to numerous discriminatory age-related statements made by McLernon. Construing the evidence most strongly in favor of plaintiffs-appellees, *Posin v. A.B.C. Motor Court Hotel, Inc.* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338, the substance of the various statements reveals two things about McLernon: (1) he harbored a bias toward older workers, and (2) his

intent was to clear out older employees. The statements were made in 1984, 1985 and 1989. Otto was terminated at the end of 1990 and Byrnes in early 1991.

**{¶ 63}** The lead opinion would have us believe that although McLernon had discriminatory animus toward the aged worker from 1984 through 1989, and at times acted upon such an attitude, it is impermissible to infer that such deep-rooted, ongoing bias against older workers persisted into early 1991. Yet there is nothing to suggest that McLernon "might have learned something in the meantime" that served to eviscerate his animus. Instead, the lead opinion appears to view verbal expressions of prejudicial intent as though they are events which take place at particular moments in time. Thus, the it is able to confine what is essentially McLernon's long-lasting and ongoing basic mental attitude or governing spirit to particularly circumscribed periods of time corresponding to the dates of his statements. However, I would have hoped that this court was a bit more sophisticated than to conclude, as a matter of law, that repeated expressions of discriminatory animus spanning a five-year period are but separate acts or occurrences each with a clearly delineated beginning and end.

**{¶ 64}** Moreover, the only case cited by the lead opinion in support of any of its critical conclusions is *Phelps, supra,* 986 F.2d at 1025.[2] Subsequent to

---

2. The lead opinion cites *Phelps* in support of the proposition that "comments which are isolated, ambiguous or abstract, or made in reference to totally unrelated employee categories cannot support a finding of age discrimination against employees in a wholly different classification." By way of clarification, *Phelps, supra*, 986 F.2d at 1025, does indeed explain that "isolated and ambiguous comments '"are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."'" Also, in deference to the lead opinion, I would note that, even though not referred to in the lead opinion, the court in *Phelps* concluded that "[b]ecause McCulloch made the statements nearly a year before the layoff, the comments were made too long before the layoff to have influenced the termination decision." *Id.*, 986 F.2d at 1026. However, *Phelps* made no mention of any rule proscribing the use of evidence of a decisionmaker's discriminatory motive regarding one employment decision or category of employees to show that decisionmaker's motives regarding another employment decision or class of employees.

*Phelps*, however, the Sixth Circuit Court of Appeals decided *Cooley, supra*. The court set forth the following pertinent facts:

"The jury believed Cooley's contention that *** he was really fired as part of a corporate effort to clear out older employees. In the course of proving his contention, Cooley testified that Patrick [the president of Carmike Cinemas by whom Cooley was employed] despised older people. For example, he related that Reddish, who had previously held the higher corporate position of vice president and general manager in Columbus, Georgia, had once told him of a strange conversation with Patrick that had taken place on a Thanksgiving Day. As Cooley remembered it, Reddish said to him:

"'[On] Thanksgiving [Patrick] made the statement, "I got to go over to my mom's and dad's and have lunch today with them. *** I don't want to go."'

"[Reddish] said, 'Well, Mike, why? This is Thanksgiving.'

"And [Patrick's] words were, "'Well, my grandmother is over there, and I just don't want to be—I don't like to be around old people."'

"Cooley further testified that, back in 1968, when Patrick was eighteen-years-old, he had come out of the movie theater after seeing 'Wild in the Streets' and said to Cooley, 'Yeah, I believe that. Everybody over 30 years old needs to be put in a pen. Yeah, if they don't want to be put in a pen, they should be confined to a concentration camp.'" (Footnote omitted.) *Id.*, 25 F.3d at 1329.

{¶ 65} In reviewing the district court's decision to admit these statements, the court examined its previous decisions, including *Phelps*, dealing with the propriety of statements allegedly showing employer bias, and explained:

"*** Patrick is the ultimate decision maker at Carmike, and Cooley had the burden to prove by the preponderance of the evidence that Patrick's resentful comments against the aged were not vague, ambiguous, or isolated. Although those two quoted comments *were not made in the context of Cooley's termination, and they had been made a long time before he was dismissed*, they do help to reveal

Patrick's state of mind and reflect a deep-rooted, ongoing pattern that is anything but isolated." (Emphasis added.) *Id.*, 25 F.3d at 1331.

{¶ 66} Thus, even the single federal circuit cited throughout the entire lead opinion allows a finding of discrimination to be based on temporally remote general comments made outside the context of plaintiff's termination. In other words, the lead opinion relies exclusively on a case from a jurisdiction that has permitted the very so-called toothpaste tube theory which the lead opinion rejects.

{¶ 67} In addition, the lead opinion seems singularly impressed with the trial court's determination that "98 percent of the evidence in the record doesn't have anything to do with age discrimination." I do not claim to have tested the mathematical accuracy of this determination, but I am not aware of any age or other invidious discrimination claim that has been decided on the basis of such a percentage. Moreover, under the direct evidence standard proposed in the lead opinion the statement "I fired plaintiff on account of his age" would (and in fact is just about the only statement that could) suffice to prove age discrimination. This single statement, had it been uttered by McLernon, would constitute considerably less than the two percent of evidence that so troubles the lead opinion. Regardless, whether the evidence of McLernon's ongoing, deep-rooted, repeated expressions of bias and intent to discriminate against the aged worker constitute two percent, ten percent, or some other percentage of the evidence in the record, it certainly amounts to substantially more and better-quality evidence than is generally considered sufficient to permit an inference of discrimination.

{¶ 68} Thus, not only does the lead opinion's direct evidence standard, couched as it is in causative language, directly contravene *Mauzy* and the United States Supreme Court holdings, but its foundational assumptions are fallacious and actually contravene its own authority.

{¶ 69} None of the foregoing, however, should be construed as an outright rejection of the application of principles of causation to an age discrimination case.

Properly construed and applied, a legal standard of causation can be helpful in determining whether age was a motivating factor in an employment decision. The ultimate question in these cases is whether the plaintiff was "discharged on account of age." *Kohmescher, supra*, 61 Ohio St.3d at 505, 575 N.E.2d at 442. As we explained in *Mauzy, supra*, 75 Ohio St.3d at 587, 664 N.E.2d at 1280, "[f]ormer R.C. 4101.17 [now renumbered R.C. 4112.14], like Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, Section 2000*e et seq*., Title 42, U.S. Code, is not a thought control law." Neither is R.C. 4112.02. "Thus, while proof of discriminatory thought is necessary to the establishment of a discrimination claim, it is not sufficient. There must be a consequential prohibited act." *Id.*, 75 Ohio St.3d at 588, 664 N.E.2d at 1280.

{¶ 70} Accordingly, R.C. 4112.02 and 4112.14 are not designed in furtherance of a state policy to prohibit mere prejudice. Prejudice is simply an irrational opinion or attitude of hostility directed against a group or class of people or their supposed characteristics. See Webster's Ninth New Collegiate Dictionary (1988) 928. Regardless of how distasteful or unsupported, prejudice is mere thought which, even if expressed, is not illegal. What these statutes prohibit is discrimination, *i.e.*, prejudice in action. An employer is free to believe whatever he or she wishes about protected groups or classes in society, so long as those beliefs do not influence his or her employment decisions.

{¶ 71} Accordingly, no derogation of the statutes results from the imposition of a standard that requires a connection (or link or nexus) between the employer's negative beliefs about a particular group or class in society and the challenged employment action. In fact, when the plaintiff's evidence consists primarily of the employer's expressions of discriminatory animus, it is helpful to restate the ultimate issue in these terms. In this way, we can ensure that liability is not premised solely upon the employer's political or social beliefs about a protected class, but is instead properly based on whether those beliefs were actually brought

to bear on employment decisions. This serves to facilitate the process of determining whether liability was based on prejudice or discrimination.

{¶ 72} However, there is a critical distinction between stating, in causative terms, the requirement that plaintiff demonstrate that he or she was discharged on account of age and requiring that to do so the plaintiff must produce the type of evidence that directly proves discrimination without the aid of an inference. Indeed, it is mere trickery to require the plaintiff to produce direct evidence of discrimination in order to satisfy a causative standard which restates a standard under which direct evidence is not required. Evidence of clear discriminatory statements made by a decisionmaker or company policymaker, like any other evidence, need not prove discrimination directly, without the aid of an inference, in order to support a finding of discrimination. Thus, evidence that a decisionmaker made discriminatory comments may support a finding of discrimination, even though an inference is required to connect the employer's state of mind expressed thereby to the challenged employment decision. In short, a discriminatory statement may constitute circumstantial evidence that a discriminatory motive was a factor in the decisional process at issue.

{¶ 73} These principles were aptly stated as follows in *Stacks v. Southwestern Bell Yellow Pages, Inc.* (C.A.8, 1993), 996 F.2d 200, 201, fn. 1:

"We use this term ['demonstrate'] advisedly, in order to avoid the 'thicket' created by some courts' use of the term 'direct evidence' to describe the plaintiff's initial burden of proof in a *Price Waterhouse* case. *See*, *e.g.*, *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1183-85 (2d Cir.1992) (describing use of the term 'direct evidence' as 'unfortunate'). We conclude that there is no restriction on the *type* of evidence a plaintiff may produce to demonstrate that an illegitimate criterion was a motivating factor in the challenged employment decision. The plaintiff need only present evidence, be it direct or circumstantial, sufficient to support a finding

by a reasonable fact finder that an illegitimate criterion actually motivated the challenged decision.

"We do not believe that our decision in *Beshears v. Asbill*, 930 F.2d 1348 (8th Cir.1991), mandates a different result. Although the *Beshears* court used the terms 'direct evidence' and 'indirect evidence,' it is clear that those terms were not used in their hornbook sense. In evaluating the evidence, the court stated that 'we conclude that Asbill did present evidence that may properly be characterized as "direct."' *Id.* at 1354. This evidence consisted of a statement by a decisionmaker 'to the effect that older employees have problems adapting to new employment policies.' *Id.* In hornbook terms, this statement constitutes circumstantial evidence (in that it requires an inference from the statement proved to the conclusion intended) that a discriminatory motive played a motivating factor in the challenged employment decision. We believe that the term 'direct evidence,' as used in *Beshears*, means only that the plaintiff must present evidence showing a specific link between discriminatory animus and the challenged decision." (Emphasis *sic*.)

{¶ 74} The lead and concurring opinions are potentially a disdainful epitaph to *Mauzy*. Our brothers and sisters below will no doubt shake their heads in consternation at the precarious force of our mandates. In evaluating circumstantial evidence in an age discrimination case, trial courts are now invited to flip the *Mauzy*/*Byrnes* coin. They will query: Do we phrase the question in causative terms and require direct evidence, or is circumstantial evidence sufficient? Is *Barker*'s four-element test for establishing a prima facie case a straight-jacket on the presentation of circumstantial evidence or one method of proof? The court today does not do justice to the law or to those below seeking a definitive answer on how to proceed in these types of discrimination cases.

{¶ 75} The decision of the court of appeals should be affirmed.

_____

**PFEIFER, J., dissenting.**

**{¶ 76}** I believe that Justice Resnick's dissenting opinion correctly articulates both what the law now is and what the requirements for proof should continue to be in age discrimination cases in Ohio. While I am sympathetic with the result achieved by the majority, I would have taken different steps to correct what appears to be an excessive jury award. This case was well and truly tried, the parties skillfully represented, and the operative law correctly stated to the jury by the trial judge. We should wring the passion out of the jury's verdict by ordering remittitur on the general verdict and eliminating the punitive damages award. Instead, the majority has massaged and convoluted the law, rendering proof of an age discrimination case unrealistically difficult for persons who most need the law's protection.

**{¶ 77}** I am concerned that this area of the law is being further "developed" in a case where the plaintiffs are high-salaried, executive-level employees. That world, artificial to most working men and women who truly need the protection of antidiscriminatory legislation, now yields a standard of proof which does not fit the real workplace world. Because we are uncomfortable seeing a jury award $7.1 million to two highly compensated executives who gladly, and knowingly, swam with sharks, we raise the bar on proof for others. This case makes age discrimination harder to prove and thus impractical for lower level, lower paid, less educated employees, who do not have the resources to pursue an increasingly complicated and complex claim. Older employees at the bottom of the economic ladder, unlawfully demoted or discharged because of their age, and without a golden parachute to cushion their fall (or to finance their litigation), are the Ohioans the majority decision hurts most.

———————————