OPINION
Plaintiff-appellant, Harold K. Baer, appeals from the February 14, 2001 decision and entry of the Franklin County Court of Common Pleas granting defendants-appellees William Kelley's and The Scotts Company's ("Scotts") motion for summary judgment. For the following reasons, we affirm.
On February 16, 2000, appellant brought an action for age discrimination in violation of R.C. 4112.02(A), contending that he was constructively demoted and subsequently constructively discharged from his long-term employment by Scotts and his former supervisor, William Kelley.
Appellant was born on April 5, 1944. (Baer affidavit at paragraph 1.) He began working for Scotts in 1969 as a consultant in the Consumer Service Department. (Baer affidavit at paragraph 3.) Appellant continued working for Scotts for thirty years, until he resigned at age fifty-five. Appellant's last day of employment with Scotts was October 29, 1999. (Baer Depo., at 14.)
Appellant was promoted to Manager of Consumer Service in late 1990. (Baer affidavit at paragraph 5.) During the 1993-1994 evaluation period, appellee Bill Kelley became appellant's supervisor. Id. Appellant's supervisors rated his overall performance as a manager as competent in 1992, 1993, 1994, 1995, and 1997. Id. In 1996, appellant received an overall evaluation of "exceeds expectations." Id. at paragraph 6.
In 1994, appellant began experiencing symptoms of anxiety and, in 1996, he began experiencing symptoms of depression. (Baer Depo., at 35.) Appellant described his symptoms of depression as a "feeling of worthlessness and the inability to go forward with the day's work, to do the normal things you would around the house." Id. In October 1997, appellant experienced what he described as a panic attack on his way home from work. (Baer affidavit at paragraph 7; Baer Depo., at 38, 45-46.) Appellant attributed the onset of the panic attack to extreme pressure he was under at work due to inadequate staffing. (Baer affidavit at paragraph 7.) Appellant sought professional help from his doctor who prescribed various anti-anxiety and antidepressant medications. (Baer Depo., at 39-42.)
In 1994, appellant hired Ed Billmaier as a Call Center Supervisor in the Consumer Services Department. (Baer affidavit at 10.) Billmaier's date of birth is January 6, 1968. (Billmaier affidavit at paragraph 1.) In appellant's estimation, Billmaier was doing a very good job, "had a lot of get-up-and-go," and was a candidate for promotion into management. (Baer Depo., at 114.) In 1997, Billmaier was promoted to Manager of Consumer Services and had a direct reporting relationship with Kelley, as did appellant. (Baer affidavit at paragraph 10; Baer Depo., at 114.) In February 1998, Billmaier was transferred to the position of Assistant Product Manager in the Marketing Department. (Billmaier affidavit at paragraph 3.)
In March 1998, Kelley sent the first of six letters expressing concern about appellant's performance, specifically appellant's failure to keep track of certain projects in addition to his daily management activities. (Baer Depo., Exh. 19.) Memoranda dated April 13, 1998, June 2, 1998, June 10, 1998, June 18, 1998, June 29, 1998, and July 1, 1998, followed the March memo. (Baer Depo., Exh. 20, 21, 22, 23, 24, and 26.) Appellant indicated that the requests escalated as the department entered the busiest time of year. Appellant stated:
 * * * At that time, I was on overload and attempting to accomplish daily tasks. I was working extended hours and still not able to accomplish all the tasks which I established as goals for myself. I had expressed my concerns numerous times to Kelley that the department was understaffed and that I was extremely busy in attempting to accomplish these necessary daily tasks. I attempted to timely respond to Kelley's tasks. However, even when I completed a task on Kelley's list, it was not dropped from the list or it appeared in a later memo as a variation. It was apparent from the tone of the memoranda and our meetings that the successful completion of the tasks was not the purpose of Kelley's interest in my position. [Baer affidavit at paragraph 13.]
Appellant gave a somewhat different version of these events in his deposition:
 Q. Did you have any idea why [Kelley] was dissatisfied with your performance?
A. Yes.
Q. What was your idea?
A. That things weren't being done on time.
 Q. Did you think his evaluation of your performance at that point was fair and reasonable?
A. Given the overload that I had altogether, no.
 Q. Did you ever discuss the fact with Mr. Kelley, in fact, you thought you were being overloaded?
A. No.
Q. Why not?
 A. I didn't think there was any chance of change of opinion. There was a time when the department was not quite the same as it was, and I'm not saying it should ever go back to the way it was. It's an efficient department. But a number of times whether I was on probation, whether I was dealing with Bill Kelley about issues and lateness and what have you and where's the claims, in some cases when dealing with my last supervisor and Ed, the senior manager at that time in '99, it was simply, "everybody's busy," as opposed to let's pick up. This person needs help right now. He's no longer the manager of department. We would pick up and do whatever we needed because of the cohesiveness of that department. That never happened.
 Q. That's a time period after Exhibit 20. [The April 13, 1998 performance memo.]
A. That's true.
 Q. Why didn't you feel you could say something to Mr. Kelley as of April 13, 1998?
 A. I didn't feel it would do any good. I didn't think it was a conversation issue that was
 Q. Why did you have that perception, that it would do no good?
A. He calls the shots; that's all.
 Q. Can you think of other occasions prior to that time, Mr. Baer, where you did go to Mr. Kelley to express some concern about things that were happening in the department, staffing issues, management styles, issues of that sort.
A. There were times I did.
 Q. And in any of those occasions did Mr. Kelley respond with an effort to try to address your concerns?
A. Yes.
 Q. Tell me why then in April of 1998 you thought that wouldn't happen.
 A. Because bringing to his attention something we might do like, we need to make a mail clerk full time rather than part time, didn't get any response or wasn't the right timing or something, and then it did happen. That's different than talking about my performance. That's a project, and my issues were overload, regardless of whether I was the manager or the senior specialist. That is exactly how I saw it.
 Q. Okay. Did you make any effort to talk to anyone above Mr. Kelley in the chain of command concerning your perception of overload?
A. No.
 No. I would not have gone to HR. I would not have gone to his superior. There was no way I would do that.
Q. You didn't go to anybody, did you?
A. No. [Baer Depo., at 134-136.]
Appellant had difficulty responding to Kelley's requests. Appellant testified:
 A. So he wrote me a memo or two reminding me I had to come up with the answers to the questions at hand and what the status was with a number of projects, and I didn't respond to those. I was drug out at that point. I mean, I got to the place where I didn't care anymore. You know, it was not even tell him, "I can't get to these things."
Q. You just didn't respond?
 A. Right. If I responded, it would be to try to get a delay, but basically I just couldn't do those things that I had agreed to do because that's the way I am. * * * [Baer Depo., at 121.]
In June 1998, Kelley requested that a Senior Consultant position be added to Consumer Services. The Senior Consultant would focus on safety issues and difficult consumer complaints, and was essentially appellant's same job without the managerial responsibilities. (Baer affidavit at paragraph 14; Baer Depo., at 122.) In July, Kelley gave appellant the option of remaining as a manager and going on a ninety-day performance improvement plan, or accepting a demotion to the position of Senior Consultant with no reduction in pay. (Baer affidavit at paragraph 16; Baer Depo., at 125.)
Appellant accepted the demotion believing he had no choice in the matter because Kelley did not offer additional personnel to assist with projects or appellant's overload. (Baer affidavit at paragraph 17.) Appellant believed that if he continued as a manager without additional personnel, he would be unable to complete the additional tasks assigned by Kelley and would more than likely lose his job. Id. Nevertheless, appellant acknowledged that no one pressured him to choose the demotion option.
 Q. Did Mr. Kelley or anyone else in the organization pressure you to choose either option?
 A. There was no pressure, except he had given me what looked like the next best thing to staying where I was, so I took that. I mean, my attitude during this was, you know, who wants to be in such a situation? Nobody. But also I was looking forward to concentrating on just those things knowing full well my management could have been a lot better, you know, but everything was suffering at that point. [Baer Depo., at 124.]
At the time appellant's demotion became effective, Billmaier returned to the Consumer Service Department as Senior Manager. (Baer Depo., at 145, 146, and 148.) Nancy Reynolds and Lisa Taubler became the Managers of Consumer Service reporting to Billmaier who, in turn, reported to Kelley. (Baer affidavit at paragraph 19; Billmaier affidavit at paragraph 4; Baer Depo., at 148.) Reynolds' date of birth is February 21, 1956. (Reynolds affidavit at paragraph 2.) Taubler's date of birth is May 5, 1961. (DeVelvis affidavit at paragraph 3.) There were now three managers, where previously, appellant alone had managed the department. (Baer affidavit at paragraph 19; Baer Depo., at 148.) The Ortho product line was being integrated into Scotts Consumer Service in 1998 and 1999, and there was a need for increased staffing. (Baer affidavit at paragraph 23; Baer Depo., at 146-147.) Scotts' consultants, including appellant, were required to participate in Ortho training. Id. This training took a substantial amount of time, and the workload increased due to consultants now being required to handle consumer issues with regard to Ortho products. (Baer affidavit at paragraph 23.)
During appellant's tenure as a Senior Consultant, the department moved to new offices. Appellant and two other older consultants were moved to an area near the door in a corner. (Baer affidavit at paragraph 29.) Appellant, John Jordan, and Bob Hessen were referred to as "old geezers" by others in the Consumer Services Department. (Baer affidavit at paragraph 29.) Billmaier and Reynolds were aware of the name and participated in discussions and conversations in which it was used. Id.
After the demotion, appellant's mother became seriously ill in December 1998, and died on January 28, 1999. In January 1999, Reynolds and Billmaier met with appellant about his performance problems and placed him on a formal performance improvement plan. (Baer affidavit at paragraph 25.) In April 1999, appellant successfully completed the plan. (Baer affidavit at paragraph 28.)
During the summer months of 1999, appellant did not receive negative comments regarding his performance. (Baer affidavit at paragraph 31.) On September 30, 1999, appellant met with Reynolds for his annual review and received an overall rating of below expectations. (Baer affidavit at paragraph 31; Baer Depo., Exh. 32.) Reynolds informed appellant that he was being placed on another performance improvement plan. (Baer affidavit at paragraph 31.) Believing his termination to be imminent, appellant submitted his written resignation on October 3, 1999. (Baer affidavit at paragraph 35.)
Appellant filed suit claiming that Scotts constructively demoted and constructively discharged him because of his age. Appellees filed a motion for summary judgment on November 22, 2000, which appellant opposed. The trial court granted appellee's motion finding that appellant had failed to establish a prima facie case of age discrimination by direct evidence or under the indirect method of proof. Even if appellant had established a prima facie case of age discrimination, the trial court further found that no reasonable jury could conclude that Scotts' articulated reason for discharge was pretextual.
It is from this judgment that appellant appeals, raising the following assignment of error:
 I. The trial court erred in granting defendants' motion for summary judgment against plaintiff's claim of age discrimination.
On appeal, appellant argues that he established direct evidence of discrimination, a prima facie case using the indirect method of proof, and evidence that appellant's alleged performance problems were a pretext for age discrimination. In addition, appellant contends the trial court failed to draw all reasonable inferences in favor of the nonmoving party.
An appellate court reviews a trial court's grant of summary judgment independently and without deference to the trial court's determination. Sadinsky v. EBCO Mfg. Co. (1999), 134 Ohio App.3d 54, 58. An appellate court applies the same standard as the trial court in reviewing a trial court's disposition of a summary judgment motion. Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107. Before summary judgment can be granted under Civ.R. 56(C), the trial court must determine that: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. Tokles Son, Inc. v. Midwestern Indemn. Co. (1992), 65 Ohio St.3d 621, 629, citing Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64, 65-66. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." Dresher v. Burt (1996),75 Ohio St.3d 280, 292. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. Id. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-359.
In Reeves v. Sanderson Plumbing Products, Inc. (2000), 530 U.S. 133, the United States Supreme Court reiterated that in reviewing a motion for summary judgment, the court should review the record as a whole, must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. The court stated:
 Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." [Id. at 151.]
With these standards in mind, we turn to appellant's argument that he established a prima facie case of age discrimination by means of direct evidence of discrimination. In Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, the Supreme Court of Ohio clarified certain aspects of the requirements for establishing a prima facie case of age discrimination. In Mauzy, the court held that "a plaintiff may establish a prima facie case of age discrimination directly by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." Id. at paragraph one of the syllabus. In Byrnes v. LCI Communication Holdings Co. (1996),77 Ohio St.3d 125, the court further stated that when relying upon direct evidence, "an employee must prove a causal link or nexus between evidence of a discriminatory statement or conduct and the prohibited act of discrimination to establish a violation." Id. at 130. "Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee." Id.
Here, appellant claimed that he established direct evidence of discrimination in three ways. First, he contends that after his demotion, the offices were relocated, and he and two other older consultants were moved to their own corner area of the Consumer Services Department. Second, a few of the full-time consultants used the term "old geezer" in reference to appellant and the other consultants in this area, and management failed to take corrective action against the persons who used the term. Finally, appellant presented statistical evidence that after his termination, the average age of the Consumer Service Department decreased from 44.86 in 1997 to 42.46 in 1999.
With respect to the alleged segregation of older employees, there is nothing in appellant's statement that establishes or suggests any discriminatory animus for the action. Appellant asserts that he was grouped with two other workers in the protected age group, but provides no information as to the ages or relative positions of the other workers' desks, whether the corner where appellant was placed was a desired or undesired location, etc. There is no link between the conduct, moving offices, and the alleged discriminatory act, constructive discharge.
With respect to the "old geezer" comment made by coworkers, this court has stated, "[t]here is a vital difference between comments which demonstrate a discriminatory animus in the decisional process and stray remarks made by nondecisionmakers." Swiggum v. Ameritech Corp. (Sept. 30, 1999), Franklin App. Nos. 98AP-1031 and 98AP-1040, unreported. Here, it is undisputed that appellant never heard Kelley, Billmaier, or Reynolds make any age-related remarks. (Baer Depo., at 63, 66.) Appellant argues that management's failure to take action when such remarks were made in their presence is sufficient to create an inference of discriminatory animus. Although the court is not to engage in weighing of the evidence, to survive summary judgment, appellant must produce more than a scintilla of evidence in support of his position. Schmitz v. Bob Evans Farms, Inc. (1997), 120 Ohio App.3d 264, 268. Appellant's evidence of stray remarks by nondecisionmakers is insufficient to constitute direct evidence of discrimination.
Appellant's statistical evidence is similarly lacking in probative value. In Swiggum, this court discussed the problems inherent in the kind of cursory statistical analysis conducted by appellant. Quoting from Adams v. Indiana Bell Telephone Co., Inc. (S.D.Ind. 1998),2 F. Supp.2d 1077, 1098, this court noted:
 Statistical evidence may prove discrimination when it shows a pattern of conduct against a protected group that, if unrebutted, would allow the inference of intentional discrimination against individual members. * * * The statistics, however, must show a "significant disparity" and must eliminate the "most common nondiscriminatory explanations for the disparity." Id. They must also bear a logical connection to the facts and circumstances being analyzed. * * *
The court went on to note that:
 * * * "[F]or statistics to be valid and helpful in a discrimination case, `both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'" * * * "Unless the statistics, standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no probative value; they do not move the proof one way or another." * * *
Here, appellant's statistics do none of the above. Appellant found a drop of two years in the average age of people in the department over a two-year period. The size of the department ranged from seven people in 1997 to thirteen people in 1999. Appellant's small statistical sample and the failure to take into account any independent variables renders his statistical evidence insufficient to support an inference of discrimination.
Appellant has also argued that he established a prima facie case of discrimination under the indirect evidence method of proof. Under this method, an employee can raise an inference of discriminatory intent indirectly by demonstrating the following: (1) that he was a member of the statutorily protected class; (2) that he was discharged; (3) that he was qualified for the position; and (4) that he was replaced by, or that his discharge permitted the retention of, a person not belonging to the protected class. The employer may then overcome the presumption inherent in the prima facie case by propounding a legitimate, nondiscriminatory reason for the employee's discharge. Finally, the employee must be allowed to show that the rationale set forth by the employer was only a pretext for unlawful discrimination. Mauzy, at 582; Barker v. Scovill (1983), 6 Ohio St.2d 146, paragraph one of the syllabus.
Scotts argues that appellant has failed to satisfy either the second or the fourth elements of the Barker test, and thus was unable to establish a prima facie case of age discrimination under the indirect method of proof. With respect to the second element, appellant claims he was constructively discharged, and the trial court improperly weighed the evidence in deciding that appellant had not been constructively discharged. The Supreme Court of Ohio set forth the test for proving constructive discharge in Mauzy. In Mauzy, the Supreme Court of Ohio reversed a trial court's grant of summary judgment concluding that it was improperly granted because of the existence of genuine issues of material fact over whether an employee had been constructively discharged because of her age. In so doing, the court set forth the following test for proving constructive discharge:
 The test for determining whether an employee was constructively discharged is whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. [Mauzy, paragraph four of the syllabus.]
In applying this test:
 * * * [C]ourts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of a preference for employees outside the protected group. * * * [Id. at 589.]
Appellant was a long-term employee whose managers recognized that he had significant skills despite his overall performance being below expectations. After his demotion, appellant was given an overall rating of "below expectations" in his 1998 performance evaluation. Appellant's supervisor, Kelley, wrote:
 In his new position, [appellant] will be able to focus on areas in which his years of experience have given him valuable expertise. Although his opportunity for contribution to the company has been repositioned, he is a valued asset to the company. [Baer Depo., Exh. 27.]
After receiving that substandard performance review, appellant was placed on a ninety-day performance improvement plan. Appellant successfully completed that plan. In his 1999 performance evaluation, appellant was also given the overall rating of "below expectations" and informed that specific developmental plans would be spelled out in a performance plan. Thus, it is difficult to see how a reasonable employee would view such an action as meaning that termination was imminent.
Appellant has not presented evidence that the performance plan Scotts proposed to put him on was impossible to complete. "[T]he presentation to the employee of other legitimate options for continued employment precludes a finding of constructive discharge." Peecook v. Northwestern National Ins. Group. (C.A.6, 1998), 156 F.3d 1231. See, also, Jackson v. Champaign National Bank Trust Co. (Sept. 26, 2000), Franklin App. No. 00AP-170, unreported (plaintiff provided no evidence that her termination was objectively imminent). Although subjectively, appellant was devastated by the review, "[t]he employee's perception of forced resignation is judged objectively without consideration of any undue sensitivities." (See Peecook.) Appellant has failed to meet the third element of the Barker test.
As the Supreme Court of Ohio said in Mauzy, the broad issue is whether appellant presented sufficient evidence to withstand a motion for summary judgment. After reviewing the entire record and making all reasonable inferences in favor of appellant, we find that appellant has failed to do so. Appellant's single assignment of error is overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
TYACK and KENNEDY, JJ., concur.