OPINION
{¶ 1} The plaintiff-appellant, John C. Lautermilch, ("Lautermilch"), appeals the summary judgment of the Common Pleas Court of Hancock County entered June 23, 2003 on motion of the defendant, Findlay City Schools, dismissing his Complaint.
 {¶ 2} Findlay City Schools employed Lautermilch from time to time as a casual substitute middle school and high school teacher beginning in 1996. Findlay City Schools does not employ substitute teachers by contract, but maintains a list of substitutes eligible to be called for casual employment as needed by the schools. Substitute teachers do not and Lautermilch did not sign a contract for employment.
 {¶ 3} During the 1997-1998 school year Lautermilch worked primarily at Findlay High School, but was not called upon to work after November, 1998. Findlay City Schools claims the right to call or not call a substitute teacher at its will. Lautermilch denies he was advised that he served at the will of his employer.
 {¶ 4} The "Guidelines for Substitute Teaching Service" with Findlay City Schools, a document with which Lautermilch is familiar, states "The conduct of the teacher should conform to the accepted patterns of behavior of the most desirable members of the community."
 {¶ 5} On November 22, 1998, Lautermilch received a message from Michael Kuri, the assistant principal in charge of scheduling teachers, informing him that he would not be needed to teach as a substitute for the rest of the week and that he must meet with Kuri and Findlay High School principal, Dr. Kathleen Crates, before he would be permitted to return to the building.
 {¶ 6} During the subsequent meeting with Dr. Crates, Lautermilch was informed that four female students had complained that he was telling inappropriate jokes and talking about sex. Dr. Crates told him she had been hearing such complaints about him for two years, and related to him the details of one instance in which a female student reported that he had made an inappropriate statement. The student quoted Lautermilch as saying, "Lips who [sic] touch alcohol may not touch mine, but it does not rule out any other part of my body." The student was requested to put the statement in writing and the statement was verified, in part, by two other students. Lautermilch admitted to saying the first part of the statement, explaining that the statement is a quote from Carrie Nation, a woman from the early 1900s or late 1800s who smashed bars to keep people from drinking too much. Lautermilch stated that he quoted the first part of the phrase when students asked him if he drank alcohol. Lautermilch claims Dr. Crates told him during the meeting that he was "too macho." Lautermilch denied engaging in the activities as alleged by Dr. Crates. However, Lautermilch did admit to tutoring a female student at his home alone after school.
 {¶ 7} Dr. Crates testified in her deposition that prior to the November, 1998 incident she had been told about several incidents involving inappropriate behavior on the part of Lautermilch. First, Dr. Crates testified that she was informed that a parent of a handicapped student did not want the child placed in a class with Lautermilch because of his reputation in the neighborhood for acting inappropriately with some children. Second, Dr. Crates testified that she was advised that Lautermilch had become close to a female high school student who was thought to be an "at risk" student and had, on at least two occasions, tutored the student at his home unsupervised. Third, Dr. Crates testified that she became aware of reports that other teachers at Findlay High School were upset with Lautermilch for "high fiving" students in the hallways, telling inappropriate jokes in the classroom and being too close with some of the students. Finally, Dr. Crates testified that she was informed that Lautermilch had commented on the size of a female teacher's breasts.
 {¶ 8} In his deposition, Michael Kuri, assistant principal in charge of substitute teachers at Findlay High School, stated that he had not talked to Lautermilch about the alleged incidents of impropriety before bringing the matter to the attention of Dr. Crates. Kuri also stated that he was not sure if there was a school policy for reporting harassment by students. Kuri admitted that he had never talked to the student who reported Lautermilch or any other witnesses. Kuri testified that Freshman Principal White conducted the full investigation of the matter.
 {¶ 9} In her deposition, Dr. Crates testified that Principal White informed her of the allegations made by the reporting student but that she had not spoken to the reporting student herself or made any independent investigation pertaining to the allegations against Lautermilch. Dr. Crates further testified that she first consulted with Dr. Ashworth, the superintendent of the school, after receiving the information regarding Lautermilch's inappropriate comments and had decided prior to the meeting with Lautermilch that she did not want him to return as a substitute teacher. Dr. Crates verified that Lautermilch was not given anything in writing regarding the allegations or the meeting.
 {¶ 10} Principal White testified in her deposition that she received a written complaint from a student in Lautermilch's class in November of 1998. White testified that she further investigated the incident by talking to two additional students. White stated that she reported the incident to Kuri, but admitted that she did not discuss the matter with Lautermilch. White testified that a Findlay City Schools Anti-Harassment Policy has been part of the board policy since January 10, 1996. Although White testified that she perceived the incident reported by the student regarding Lautermilch as possibly harassment, a formal complaint was never filed against Lautermilch. The board policy states that if complaints of harassment are not formally resolved, they may be reduced to writing and filed with the superintendent and will be investigated by the superintendent or his designee. The board policy also states that in making determinations under the policy, "the totality of relevant circumstances will be considered on a case by case basis."
 {¶ 11} Lautermilch claims he was advised that Dr. Crates needed time to look into the matter and that she would get back to him. Dr. Crates testified that she told Lautermilch she needed to be in contact with the superintendent, Dr. Ashworth, because she made the final decision. Lautermilch denied being advised that he had the right to talk to Dr. Ashworth about the situation if he disagreed with Dr. Crates' decision. Consequently, Lautermilch never spoke with Dr. Ashworth. Lautermilch was not contacted by Dr. Crates, or by anyone else affiliated with Findlay High School, as to his employment status. Lautermilch was not called back to work and was allowed into the building on only one occasion, in which he entered the auto shop with permission of an assistant superintendent.
 {¶ 12} Lautermilch filed a complaint against Findlay City Schools in the United States District Court for the Northern District of Ohio, Western Division, on April 20, 2000. In his complaint, Lautermilch alleged that the actions of Findlay City Schools resulted in a denial of due process and a deprivation of his property interest in his substitute teaching job. Lautermilch also alleged that Findlay City Schools deprived him of rights and privileges and immunities arising out of the First,Fifth and Fourteenth Amendments of the United States Constitution. In addition, Lautermilch brought claims under Ohio statutory law for reverse sex discrimination and under Ohio common law for public policy tort.
 {¶ 13} On April 19, 2001, summary judgment dismissing Lautermilch's federal claims under 42 U.S.C. § 1983 was granted in favor of Findlay City Schools. Lautermilch's state law claims were dismissed without prejudice on the basis of lack of jurisdiction. The United States Court of Appeals for the Sixth Circuit affirmed the decision on January 3, 2003. Lautermilch filed a petition for writ of certiorari with the United States Supreme Court on May 7, 2003. The petition was denied by the United States Supreme Court on October 6, 2003.
 {¶ 14} In order to preserve his state law claims, Lautermilch filed the instant action in the Common Pleas Court of Hancock County on September 10, 2001. Findlay City Schools filed a motion for summary judgment on January 3, 2003. On June 23, 2003, the Common Pleas Court of Hancock County granted summary judgment in favor of Findlay City Schools dismissing all four counts of the complaint. Is it from this judgment that Lautermilch now appeals, raising the following three assignments of error:
The trial court erred in finding that Plaintiff-Appellant's first andsecond claims for relief in his Complaint were barred by res judicata asa result of his prior federal action because the Federal Courts applied adifferent standard for sex discrimination than is used under Ohio law.
 The trial court erred in finding that Plaintiff-Appellant failed toestablish that there exists a sufficiently clear public policy againstactions by Defendant-Appellee.
 The trial court erred in finding that Plaintiff-Appellant is notentitled to punitive or exemplary damages because the lower court erredin granting summary judgment in favor of Defendant-Appellee on allissues.
 {¶ 15} We first note that the standard for review of a grant of summary judgment is one of de novo review. Lorain Natl. Bank v. SaratogaApts. (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Thus, such a grant will be affirmed only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In addition, "summary judgment shall not be rendered unless it appears * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence construed most strongly in his favor." Id.
 {¶ 16} The moving party may make his motion for summary judgment in his favor "with or without supporting affidavits[.]" Civ.R. 56(B). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." Mitseff v. Wheeler
(1988), 38 Ohio St.3d 112, syllabus, 526 N.E.2d 798. Summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. Murphy v. Reynoldsburg,65 Ohio St.3d 356, 1992-Ohio-95, 604 N.E.2d 138. Once the moving party demonstrates that he is entitled to summary judgment, the burden then shifts to the non-moving party to show why summary judgment in favor of the moving party should not be granted. See Civ.R. 56(E). In fact, "[i]f he does not so respond, summary judgment, if appropriate, shall be entered against him." Id.
 {¶ 17} In his first assignment of error, Lautermilch asserts that res judicata does not bar his cause of action for sex discrimination because the federal court used a different standard for its decision of the federal equal protection claims than is used under Ohio law.
 {¶ 18} With regard to the issue of res judicata, "[t]o the extent to which a federal court judgment operates as res judicata in the federal court, it also operates as res judicata in Ohio state courts." Powell v.Doyle (Oct. 8, 1998), 8th Dist. No. 72900, unreported, 1998 WL 703012, *3, citing Horne v. Woolever (1959), 170 Ohio St. 178, paragraph six of the syllabus, 163 N.E.2d 378. In order for a claim to be barred on the grounds of res judicata, the new claim must share three elements with the earlier action: (1) identity of the parties or their privies; (2) identity of the causes of action; and (3) a final judgment on the merits. D K Properties Crystal Lake v. Mut. Life Ins. Co. of NewYork (C.A. 7, 1997), 112 F.3d 257.
 {¶ 19} In determining whether res judicata bars an appellant's state law claims we first review the identity of the parties in each action. Lautermilch does not deny that the instant state case involves the same parties as the federal case, to wit, appellant John C. Lautermilch, and appellee Findlay City Schools. Second, Lautermilch does not deny that he brought the same causes of action in both the federal and state courts. In the federal court, Lautermilch claimed unlawful sex discrimination in violation of Title 42, U.S. Code. In the instant action, Lautermilch claims sex discrimination in violation of R.C. Chapter 4112. Regarding the third prong of the test, the federal court made a final judgment on the merits of the case, concluding that Lautermilch failed to set forth a prima facie case of discrimination. Lautermilch asserts that the standard employed by the federal court in analyzing his sex discrimination claim is more stringent than the standard employed under state law and, therefore, there was no final judgment on the merits of the case under state law.
 {¶ 20} Lautermilch seeks to have his sex discrimination claim analyzed under the direct evidence framework, rather than the McDonnell-Douglas/Burdine framework, as applied by the federal courts. Lautermilch asserts that the McDonnell-Douglas test does not apply where the plaintiff presents direct evidence of discrimination. Trans WorldAirways, Inc. v. Thurston (1985), 469 U.S. 111, 105 S.Ct. 613,83 L.Ed.2d 523. Ohio law generally provides that a plaintiff must prove discriminatory intent on the part of the employer in order to prevail in an employment discrimination case. Mauzy v. Kelly Services, Inc. (1996),75 Ohio St.3d 578, 664 N.E.2d 1272. A plaintiff can choose to prove his claim under either the direct or indirect method of proof. Byrnes v. LCICommunication Holdings Co. (1996), 77 Ohio St.3d 125, 672 N.E.2d 145. A plaintiff may establish a prima face case by presenting direct evidence, of any nature, to show discrimination on the part of the employer.Mauzy, 75 Ohio St.3d at 586-87. Once the plaintiff makes this prima facie case, the burden shifts to the defendant to prove its actions were not motivated by discriminatory intent. Laderach v. U-Haul of NorthwesternOhio (C.A. 6, 2000), 207 F.3d 825, 829.
 {¶ 21} Under federal law, which is similar to Ohio law, a plaintiff can prove discriminatory intent on the part of the employer by presenting direct evidence of discrimination, or by presenting circumstantial evidence to create the inference of discrimination. Talley v. BravoPitino Rest., Ltd. (C.A. 6, 1995), 61 F.3d 1241. With the indirect method of proof, a plaintiff may establish discriminatory intent using the analysis set forth in McDonnell Douglas Corp. v. Green (1973),411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.
 {¶ 22} Under the McDonnell Douglas framework, the plaintiff must present some evidence showing sex discrimination under the following elements: (1) plaintiff is a member of a protected class; (2) plaintiff was subjected to adverse employment action; (3) plaintiff was qualified for the position; and, (4) plaintiff was replaced by a person outside of the protected class. McDonnell Douglas, 411 U.S. at 802. If the plaintiff succeeds in proving his prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [discharge]." McDonald v. Union Camp Corp. (C.A. 6, 1990),898 F.2d 1155, 1160, quoting McDonnell Douglas, 411 U.S. at 802. If the employer is able to set forth a nondiscriminatory reason for the discharge, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer are not the true reasons, but rather a pretext for discriminating against the plaintiff.Texas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248, 253,101 S.Ct. 1089, 67 L.Ed.2d 207.
 {¶ 23} Lautermilch asserts that, under Ohio law, his sex discrimination claim should have been analyzed under the direct evidence of proof method rather than the more stringent standard of McDonnell Douglas which he argues the federal courts applies. The McDonnell Douglas framework is a method of establishing a prima facie case of discrimination by indirect proof. As the Ohio Supreme Court stated inMauzy:
The importance of McDonnell Douglas lies, not in its specification ofthe discrete elements of proof there required, but in its recognition ofthe general principle that any Title VII plaintiff must carry the initialburden of offering evidence adequate to create an inference that anemployment decision was based on a discriminatory criterion illegal underthe Act.
 Mauzy, 75 Ohio St.3d 584 (citations omitted). However, as we discussed earlier, a plaintiff can avoid the McDonnell Douglas analysis by providing direct evidence of discrimination. The Mauzy court clarified the meaning of direct evidence stating, "[i]t means that a plaintiff may establish a prima facie case [of sex discrimination] directly by presenting evidence, of any nature, to show that the employer more likelythan not was motivated by discriminatory animus." Mauzy,75 Ohio St.3d at 586-587 (emphasis added).
 {¶ 24} Although the Sixth Circuit and the District Court analyzed the sex discrimination claim presented by Lautermilch under the McDonnell Douglas/Burdine framework, the federal courts addressed Lautermilch's claim under the direct evidence method as well. The Sixth Circuit Court of Appeals commented on Lautermilch's sex discrimination claim as follows:
Lautermilch attempts to hang his entire prima facie case on one offhandcomment by Principal Crates (that he was "too macho"). This evidence doesnot `require the conclusion that unlawful discrimination was at leasta motivating factor in the employer's actions,' and, therefore, he hasnot established a prima facie case under Laderach. [citation omitted]Specifically, when the comment is placed in the context of the terminationhearing documenting specific allegations of misconduct, any reasonabletrier of fact would conclude the comment was critical of Lautermilch'sbehavior, not his sex or gender.
 Lautermilch v. Findlay City Schools (C.A. 6, 2003), 314 F.3d 271, 276.
 {¶ 25} Lautermilch fails to present evidence of discrimination that is sufficient to shift the burden to the employer, Findlay City Schools. The isolated comment attributed to Dr. Crates, that Lautermilch was "too macho," if made, is insufficient by itself to constitute a prima facie case of sex discrimination. While we do not believe that such a phrase will be insufficient to prove a prima facie case of discrimination in all circumstances, the isolated comment by Dr. Crates in this case coupled with the numerous allegations of inappropriate behavior by Lautermilch that support his termination are insufficient as direct proof of sex discrimination. The "too macho" comment does not meet the standard underMauzy that the employer was more likely than not motivated by discriminatory intent. Mauzy, 75 Ohio St.3d at 586-587. Lautermilch does not present any other evidence of sex discrimination by Findlay City Schools. Since Lautermilch failed to present direct evidence of discrimination, the federal courts proceeded to analyze the sex discrimination claim under the McDonnell Douglas/Burdine framework. Lautermilch failed to meet his burden under that analysis as well.
 {¶ 26} Even if Lautermilch had established a prima facie case of sex discrimination through direct evidence, Findlay City Schools would still be entitled to summary judgment since when the burden is shifted Findlay City Schools can prove that their actions were not motivated by discriminatory intent. In fact, Findlay City Schools has shown that there was a pattern of behavior by Lautermilch that justified their actions in taking Lautermilch off the list of substitute teachers utilized by the school. Dr. Crates, principal of Findlay High School, testified in her deposition that she was concerned about retaining Lautermilch as a substitute teacher because she noted a pattern of inappropriate behavior. Dr. Crates provided a list of specific instances that constituted a pattern of inappropriate behavior by Lautermilch that spanned two years. Therefore, Lautermilch's claim of sex discrimination would fail despite classifying the isolated comment of "too macho" by Dr. Crates as direct evidence.
 {¶ 27} We conclude that Lautermilch's assertion that res judicata should not apply is without merit. Both the federal and state cases involve causes of action for intentional discrimination based on sex and both require the application of the same legal standards and evidentiary burdens. Furthermore, this court generally applies federal case law interpreting Title 42 of the U.S. Code to matters involving alleged violations of R.C. Chapter 4112. See Little Forest Med. Ctr. of Akron v.Ohio Civ. Rights Comm. (1991), 61 Ohio St.3d 607, 609-610, 575 N.E.2d 1164;Plumbers Steamfitters Joint Apprenticeship Comm. v. Ohio Civ.Rights Comm. (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128.
 {¶ 28} Upon review of the case law and the record, we conclude that Lautermilch's claim of sex discrimination should be addressed here in a manner consistent with that applied by the federal courts in this case. We, therefore, hold the doctrine of res judicata bars Lautermilch's state claims of sex discrimination. Accordingly, Lautermilch's first assignment of error is overruled.
 {¶ 29} In his second assignment of error, Lautermilch argues that public policy in Ohio is violated by the court allowing hearsay statements of several students with alleged disciplinary problems to be the basis for his termination when he was not afforded an opportunity to refute the statements. Lautermilch relies on the case of Wells v. Ormet Corp. (Mar. 17, 1999), 7th Dist. No. 798, unreported, 1999 WL 159231, * 2, to support his argument that there exists a public policy favoring "a fair workplace, truthful grievance proceedings, job stability for long-term employees, and economic productivity." The court below distinguished theWells case on its facts from the case sub judice. We also feel that the cases are distinguishable.
 {¶ 30} In the Wells case, the appellant was the general foreman of a division of Ormet Corporation where he had worked for nineteen years. Id. at *1. After an incident in which five employees reported off work, requiring a shift to be canceled, appellant met with union officials to determine whether the absences of the employees were a concerted effort to shut down the plant. Id. Although appellant and the Labor Relations Specialist concluded that the employees called off independently and not collaboratively, the general manager of the plant disagreed and suspended each employee. Id. At a formal hearing requested by the union, appellant was asked by a union official if he believed that the employee absences were part of a concerted plan, in which appellant responded in the negative. Id. Appellant was then discharged from employment. Id. The court found that Ormet Corporation jeopardized the public policy supporting the societal interests of "a fair workplace, truthful grievance proceedings, job stability for long-term employees, and economic productivity" by discharging appellant. Id. at *2.
 {¶ 31} Lautermilch's circumstances differ greatly from those governing the Wells case, as the Wells holding demonstrates:
[t]he issue before this court is whether there exists a sufficientlyclear public policy against the corporate firing of a member ofmanagement for answering a question in a way that favors the laborers'position at a grievance hearing. Due to the fact that appellant was anineteen-year veteran worker at the corporation and the fact that he wasonly answering the question in a manner that he believed was beingdirected by the corporation's labor relations specialist, we hold that,as limited to the facts alleged in the complaint, a sufficiently clearpublic policy was violated by appellant's discharge. (emphasis added)
 {¶ 32} Id. Therefore, the holding of the Wells case was not intended to apply to cases of employee discharge across the board. Furthermore, there does not readily appear to be any material similarity between the facts in the Wells case and those in the case sub judice.
 {¶ 33} This court has previously relied on the general premise that all employment in Ohio is considered at-will employment when deciding cases of alleged employment discrimination. An at-will employment relationship is one which either party may terminate for whatever reason and whenever either desires to do so. Mers v. Dispatch Printing Co.
(1985), 19 Ohio St.3d 100, 483 N.E.2d 150. However, this doctrine has been limited by various statutes, constitutional amendments and case law. See R.C. 4112.02; Painter v. Graley (1994), 70 Ohio St.3d 377,639 N.E.2d 51. The Ohio Supreme Court has specifically determined that "[p]ublic policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." Greeley v. Miami Valley Maintenance Contractors,Inc. (1990), 49 Ohio St.3d 228, paragraph one of the syllabus,551 N.E.2d 981, overruled on other grounds by Tulloh v. Goodyear AtomicCorp. (1992), 62 Ohio St.3d 541, 584 N.E.2d 729. The court, therefore, permits wrongfully discharged employees "a cause of action for wrongful discharge in violation of public policy" in tort. Id. at paragraph three of the syllabus.
 {¶ 34} In determining what constitutes a sufficiently clear public policy, the Ohio Supreme Court has held:
We have confidence that the courts of this state are capable ofdetermining as a matter of law whether alleged grounds for a discharge,if true, violate a `clear public policy' justifying an exception to thecommon-law employment-at-will doctrine, thereby stating a claim. Inmaking such determinations, courts should be mindful of our admonitionin Greeley that an exception to the traditional doctrine ofemployment-at-will should be recognized only where the public policyalleged to have been violated is of equally serious import as theviolation of the statute.
 Painter, 70 Ohio St.3d at 384.
 {¶ 35} The issue before this court is whether there exists a sufficiently clear public policy against the termination of a substitute teacher due to allegations by students at the school of the teacher's inappropriate behavior. This determination requires a review of R.C.3319.10, which provides the employment and status of substitute teachers in Ohio.
Teachers may be employed as substitute teachers for terms not to exceedone year for assignment as services are needed to take the place ofregular teachers absent on account of illness or on leaves of absence orto fill temporarily positions created by emergencies; such assignment tobe subject to termination when such services no longer are needed.
* * *
Teachers employed as substitutes on a casual or day-to-day basis shallnot be entitled to the notice of nonremployment prescribed in section3319.11 of the Revised Code * * *. (emphasis added).
R.C. 3319.10.
 {¶ 36} Lautermilch has failed to establish that there exists a sufficiently clear public policy against his termination as a substitute teacher by Findlay City Schools. R.C. 3319.10 allows for the discharge of Lautermilch when his services are no longer needed and does not require notice of nonremployment to be given. The provisions of R.C. 3319.10 are in line with the employment-at-will doctrine. Without presenting a recognized policy exempting him from the at-will doctrine, Lautermilch could be discharged by Findlay City Schools for any reason. Accordingly, the trial court did not err by rendering summary judgment in favor of Findlay City Schools and Lautermilch's second assignment of error is overruled.
 {¶ 37} Lautermilch's third assignment of error asserts that he is entitled to a determination of punitive or exemplary damages because the trial court erred in granting summary judgment in favor of Findlay City Schools on all issues. Having found no merit with Lautermilch's first and second assignments of error, we conclude that the trial court did not err in granting summary judgment in favor of Findlay City Schools, which precludes Lautermilch from recovering any damages. Accordingly, Lautermilch's third assignment of error is overruled.
 {¶ 38} Having found no merit with Lautermilch's assignments of error, the judgment of the Common Pleas Court of Hancock County is affirmed.
Judgment affirmed.
Shaw, J., concurs separate.