[Cite as *Griffin v. Springfield Regional Med. Ctr.*, 2013-Ohio-1819.]

IN THE COURT OF APPEALS FOR CLARK COUNTY, OHIO

MARY GRIFFIN                   :

    Plaintiff-Appellant            :           C.A. CASE NO. 2012 CA 66

v.                              :           T.C. NO.    11CV463

SPRINGFIELD REGIONAL MEDICAL    :       (Civil appeal from
CENTER, et al.                           Common Pleas Court)

    Defendants-Appellees       :

                                        :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the _____3rd_____ day of _____May_____, 2013.

. . . . . . . . . .

RUSSELL A. KELM, Atty. Reg. No. 0011034 and JOANNE W. DETRICK, Atty. Reg. No. 0041512, 37 West Broad Street, Suite 860, Columbus, Ohio 43215
       Attorneys for Plaintiff-Appellant

STEVEN J. McCREADY, Atty. Reg. No. 0009447 and SAMUEL E. DOWSE, Atty. Reg. No. 0082593, 1 S. Limestone Street, Suite 800, P. O. Box 1488, Springfield, Ohio 45501
       Attorneys for Defendants-Appellees

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     This matter is before the Court on the Notice of Appeal of Mary Griffin, filed September 20, 2012.  Griffin appeals from the decision of the trial court granting

summary judgment in favor of Springfield Regional Medical Center ("SRMC") on Griffin's age discrimination claim. We hereby affirm the judgment of the trial court.

{¶ 2} Griffin, who was employed at SRMC as the Team Leader for the nurses in the open heart unit, filed her complaint on May 13, 2011, against SRMC, Julia Skrlac, the Nurse Manager of ICU for SRMC; Michelle Adkins, the Director of Critical Care at SRMC; Terry Boys, the Director of Nursing at SRMC; and Mark Wiener, the Chief Executive Officer of SRMC. Griffin alleged that "at age 57 after 40 year's employment by SRMC and its predecessors, she was pretextually terminated on November 19, 2010." Griffin subsequently dismissed her claims against Adkins and Wiener.

{¶ 3} On July 19, 2012, SRMC, Skrlac and Boys (collectively, "Defendants") filed their motion for summary judgment as well as the depositions of Griffin, Skrlac, Boys, Wiener and Adkins. In their motion, Defendants asserted that Griffin's employment at SRMC was terminated "for theft. Specifically, from August 11, 2010 through November 19, 2010, Plaintiff added four hours per week, for a total of twenty-eight (28) work hours, to her time logs. Plaintiff received extra compensation * * * for these additional work hours." Defendants asserted that "Skrlac repeatedly asked Plaintiff to provide documentation to justify the additional work hours. Plaintiff failed to produce any documentation to Skrlac, and thus was terminated * * * for theft of company property, to wit: receiving extra compensation without providing [SRMC] with documentation, as requested, to justify said compensation."

{¶ 4} At her deposition, Skrlac testified that she became Griffin's supervisor in July, 2009. She testified that there was a shortage of open heart nurses

trained for the night shift at SRMC, and that in August, 2009, she directed Griffin to "coordinate the training of more nurses on night shift" because "she was our open heart team leader." Skrlac stated that all of the full time nurses at SRMC work three 12-hour shifts in a week. Skrlac stated that Griffin "couldn't understand why I would want anyone but her to provide the training as far as precepting." Skrlac testified that she responded to Griffin as follows:

I explained to her that as the team leader - - we have an educator for ICU. The educator coordinates the education. She teaches classes and she coordinates the orientation as far as who's going to precept that person. If I count on her to precept every single one of my new employees, I would never get anyone hired.

So my expectation is that Mary was going to coordinate the precepting, not do all the precepting. She felt that she was the only one capable - - she stated to me that she was the only one capable of precepting, teaching classes, and checking people off to be open heart nurses.

{¶ 5} Skrlac stated that she did not believe that she and Griffin could resolve the issue "one-on-one," so on March 19, 2010, Skrlac "got my director involved and we set up a meeting to meet with the director of cardiac services, which is Bill Rich; Michelle Adkins, who was my director; and Mary to discuss how we could develop this program * * * ." Skrlac stated that at the meeting, "Mary threatened to quit because she felt that we were trying to get her to get out of the position. * * * At that point in time, my director told her that was not our intention * * *. We asked that she develop a team of nurses that she

trusted that could hold people to the standards that she held herself and others to, * * *." Skrlac stated that Griffin was given a week to decide if she wanted to remain in her current position.

{¶ 6} After Griffin indicated that she wanted to remain in the position, Skrlac stated that she directed her to complete "an action plan," as follows:

> * * * I wanted to know what types of classes she was going to teach. I wanted objectives. I wanted to know who her audience was going to be. I wanted a calendar of when those classes were going to be available to staff.
>
> At that point, I believe I also asked her to let me know when - -to justify why she had been adding an additional 4 hours every week unbeknownst to me.

{¶ 7} Regarding the extra four hours, Skrlac stated, Griffin "told me it was for open heart paperwork. That's how she wrote it in our edit log as well." Skrlac stated that Griffin advised her that the additional four hours had been authorized by Skralc's predecessor. Skrlac stated, "I wasn't getting any justification as to why she was doing the 4 hours in the first place, so she would have to prove to me that she really needed more time and show me what she had been working on. Regardless of what it could be, I would need to know what that time would be spent on."

{¶ 8} Skrlac stated that Griffin was given a deadline of April 16, 2010 to complete the action plan, and that Griffin did not do so. After Skrlac contacted Griffin regarding the plan, she testified that Griffin stated that there had been a death in her family, and she asked for an extension. According to Skrlac, she extended the deadline until April 26, 2010, and

at that time, she again received no response. Skrlac stated that she eventually received "some paperwork" from Griffin, "but it wasn't complete." Skrlac stated that she requested that Griffin make "several corrections" to the paperwork, but that Griffin failed to do so until December, 2010, after she had been terminated. Skrlac stated that Griffin made "[l]ess than half" of the recommended changes.

{¶ 9} The following exchange occurred:

Q. Was [Griffin] supposed to provide you justification from that April meeting [regarding the four additional hours]?

A. Yes. What she did in that April meeting was provided me a list of things that she should be doing, but no proof of it. Like she said she would do paperwork, like chart audits, but have nothing to show for that.

Q. So you wanted copies of what she was actually doing?

A. I wanted something to demonstrate what the work actually was that she did.

Skrlac testified that she and Julia Truman, of the Human Resources Department, made the decision to terminate Griffin "for not justifying the 4 hours which was considered the same as stealing."

{¶ 10} In her deposition, Boys testified that she "was not involved in any issues with Mary" leading up to her termination. Boys testified as follows:

Q. What involvement, if any, do you recall that you had in the termination of Mary Griffin?

A. I was involved in a discussion with Mary after her termination.

\* \* \*

Q.   Tell me the context in which you talked to her.

A.   We had a meeting with herself, myself, Michelle and Julie Truman.  I'm not for sure if anybody else was in the room.  We discussed the request for her to bring forward a document, which had previously been requested to be provided, and that if she did so, I would be able to offer her retirement as opposed to termination.

\* \* \*

A.   My request was to allow her to have an opportunity to bring forward something that she was requested to bring forward and if that were the case, then she would not be terminated, she would be offered the ability to retire.

Q.   What was the advantage to her being offered to retire? \* \* \*

A. \* \* \* she was able to participate in the recognition ceremony for her years of service, she was able to receive a dollar amount, which, I believe, was $1,000, for her years of service recognition; she was able to not be terminated.

\* \* \*

Q.   What was the resolution of the meeting?

A.   Mary agreed that she would bring forward the document within a specified time.

Q.   What was the time? \* \* \*

A. The next day by noon, I believe.

Q. Did she do that?

A. She did.

Q. And what did you do as a result of her doing that?

A. I reviewed the document and based on the - - it did show that there had been work done on a document that she brought to me as compared to a previous document that she had been requested to modify.

Q. Okay.

A. I requested for her the ability for her to retire.

* * *

Q. Did you consider the alternative that she requested of being reinstated?

A. No, I did not because she was terminated for a reason that I felt was the right reason for termination.

* * *

Q. So you asked Mary to produce the document * * * and she did, so apparently to the extent that they said she was stealing time because she wasn't preparing the revision to that program, they were wrong because she had been, and you confirmed that, didn't you?

A. She produced a document that showed that there was a revision.

Q. So why not reinstate her or, for instance, why not ask her to pay back any time you thought she had been paid for she didn't do work or

suspend her for 30 days without pay? Why would you terminate a 42-year employee over this issue? * * *

A. This employee produced a document after many times being requested of which the document does not reflect multiple hours of time. The changes that were in the document do not reflect the amount of time that she put forth on a document to be paid.

Q. So why not deduct from her pay what you thought - -

A. Because it's theft.

Boys testified that after Griffin's termination, there is no longer an open heart team leader.

{¶ 11} At her deposition, Griffin testified that she was 56 years old at the time of her termination[1], which occurred on November 19, 2010. She stated that she was terminated by Skrlac and Julia Truman alone, and that they told her that she was being terminated because she failed to "revamp" the entire open heart program at SRMC. Griffin stated that Michelle Adkins and Bill Rich told her that they did not want her to step down in the March meeting with Skrlac. Griffin stated that her work week consisted of three 12-hour shifts and four hours of "open heart work," which included instructing nurses and other staff at the hospital and also completing paperwork at home. Griffin stated that she was "taken out of the team leader role" for 90 days on May 11, 2010, for failure to turn in her paperwork, and given 48 hours to do so. She continued to work and receive pay during her suspension from the role as team leader, and she stated that she provided the paperwork

---

[1] We note that the errata sheet attached to her deposition provides that she misstated her age and that she was in fact 57 when terminated.

on May 13, 2010. She stated that in August, she "was reinstated as the open heart team leader and I started adding the four hours." Griffin stated that in her meeting with Truman and Skrlac in November, Truman stated, "'I will give you 40 minutes to go home, get all your paperwork that you have completed," and that it was "physically impossible" for her to do so given the distance to her home, snow on the roads, and the fact that the paperwork was not compiled. Griffin also testified that she told Skrlac "that it was impossible to revamp the whole open heart program. I had only been working on it for four hours a week since August, * * * ." Griffin stated that she gave Boys the post-termination paperwork on December 17, 2010.

{¶ 12} Griffin stated that she was aware that there was a shortage of open heart nurses on the night shift, and that she "tried to do everything to in my realm to train those nurses. I offered to work any day of the week. I offered to work five days in a row. I would come in on my days off. * * * ." Griffin stated that Skrlac "wanted Amanda Dillow and she wanted Peggy Allen and she wanted Robyn Wollum and Wendi Young" to "do all aspects of my job," and she testified, "I did not want those people to be teaching open heart classes and precepting the nurses." Griffin stated that Skrlac told her that "Robyn Wollum was going to be the co-team leader for open heart * * * and share the team leader duties with me." When asked if she was worried "about them getting rid of your job," Griffin replied, "I was more worried about them training the nurses and the nurses not having the same level of skill necessary, * * * ." Griffin further testified as follows:

> * * * Nurses that I had precepted that had been working as open heart
> nurses for a number of months could also teach classes. I took exception to

that.

I thought that more experienced nurses, skilled nurses, and also emotionally responsible nurses, which we have some nurses that are - - their maturity levels are not all the same, * * *

* * *

* * * [Skrlac and Adkins] mentioned some people that they might want to teach the open heart classes.

* * *

The first one was Amanda Dillow, who I felt was immature. She talked on the phone a lot, played on the computer. The second one was Peggy Allen, who I thought did a lot of frivolous talking with doctors and other male employees and was subsequently discharged from the organization for using intravenous drugs that she was stealing from the hospital. There was another nurse who I also felt was emotionally immature and was having extramarital affairs with people at the hospital.

I did not feel that those people represented the open heart program and that they should be teaching, being a person that would be followed and imitated in their nursing process.

{¶ 13} Griffin stated that she was "the only team leader for open heart in the ICU." The following exchange occurred:

Q. Were there other team leaders in other areas of ICU?

A. No.

Q. So there were no other team leaders in ICU, correct?

A. There were not technically team leaders, but there were charge nurses who had another name - - maybe they called them care coordinators - -

* * *

Q. But they were not team leaders, correct?

A. They were not team leaders.

* * *

A. They were not as high on the chain as I was * * * .

Q. In fact, you were kind of in a unique position as a team leader, correct?

A. Yes, I was.

Q. Because these other people you're talking about were not as high on the chart as you were, correct?

A. Correct. * * *

Q. Julia didn't have anybody reporting to her that was in a similar position to yours on the org chart, correct?

A. Correct.

{¶ 14} Regarding her termination for theft, the following exchange occurred:

Q. * * * Do you know of anyone else at [SRMC] that's been accused of stealing time but was not terminated?

A. No. There was another person that was terminated, but I don't know what her name was.

Q. You mean for stealing time?

A. Yes.

Q. So you weren't the only one who was terminated for stealing time?

A. No. As far as I know, there was one person; but I don't know what her job was or what her name was.

Q. Do you know of any other person who was authorized to add 4 hours to their regular hours for paperwork?

A. Sherry Fenters.

Q. What was her position?

A. Staff nurse. I don't know how many hours she got to add for that. I think it was somewhere around 4.

* * *

Q. Do you know of anyone who was terminated for refusing to justify adding 4 hours for paperwork?

A. No - - well, you know, that one person; but I don't know what her deal was. I don't know what her name was, what her position was, anything.

Q. Right. You don't know whether it was for not justifying it, you just know that it was for stealing time, correct?

A. That's the way they termed it.

* * *

Q. And do you know anyone who refused to justify why they added

4 hours of time on a regular basis but was not terminated?

A. I don't know anyone else.

MR. KELM: Besides herself you mean?

THE WITNESS: I do know myself. I was in kind of a unique position because being the team leader of open heart and also working 36 out of my 40 hours, you know, there really was not anyone else that I know of that - -

BY MR. MCCREADY: There were no employees who were similarly situated, correct?

A. There was a team leader for dialysis. I don't know how their reimbursement worked.

Griffin stated that she had "no idea" whether the team leader for dialysis reported to Skrlac.

{¶ 15} The trial court's brief decision sustaining SRMC's motion for summary judgment provides in relevant part as follows:

Upon review of the pleadings, depositions, motions, memorandums and arguments of counsel, the Court adopts the reasoning set out in defendant's memorandum and finds plaintiff has not presented any evidence to show that [SRMC's] decision to terminate her for theft was not the real reason. Plaintiff has not presented any evidence to support her claim of age discrimination or to establish that [SRMC's] legitimate, non-discriminatory reason for her termination was pretextual.

{¶ 16} Griffin asserts one assignment of error herein as follows:

"THE TRIAL COURT ERRED IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S AGE DISCRIMINATION CLAIM."

{¶ 17} Griffin asserts that she "establishes her age discrimination under Ohio Revised Code §4112.02 and §4112.99, predicated on Defendants' treating her disparately in the terms and conditions of her employment and her termination because of her age." Griffin asserts that she "establishes direct evidence of discrimination." Specifically, she asserts that Boys made "references to her retirement." According to Griffin, "Boys first suggested that if Plaintiff brought in certain paperwork the following day, she would consider changing her termination to retirement." Griffin asserts that she sought reinstatement, but due to her age, "Boys assumed that Plaintiff would want to retire." Griffin further asserts that two physicians recommended that her termination be reconsidered, but that "Boys, however, would only consider retirement as an option for" her. Griffin relies upon *Kohmescher v. Kroger Co.*, 61 Ohio St.3d 501, 575 N.E.2d 439 (1991) in support of her assertion that direct evidence of discrimination exists.

{¶ 18} Griffin further asserts that she established a prima facie case of age discrimination by proving that she is a member of a protected class, that she suffered an adverse employment action, that she was qualified for her position, and that "[s]ubstantially younger nurses were treated more favorably than Plaintiff." Griffin presents a lengthy list of examples of the allegedly disparate treatment she received, although she identifies none of the "substantially younger nurses" who were treated more favorably. We note that in her interrogatory responses, which she attached to her memorandum in opposition to Defendants' motion for summary judgment, she lists the names "Amanda Dillow RN,

Wendi Young, RN," as the "substantially younger workers" referenced in her complaint.

{¶ 19}   Finally, Griffin asserts, having "presented both direct and circumstantial evidence of age discrimination, Plaintiff may survive Defendant's summary judgment motion by presenting evidence which would allow a jury to find Defendant's articulated reason for the adverse action to be unworthy of belief, and therefore a pretext for the discrimination."   According to Griffin, Defendants' argument that she "was stealing time was factually false," and that since she proved that she "did in fact complete the work and was not stealing time, Defendants' proffered reasons were not sufficient to motivate" her termination.   Griffin asserts that "defendants displayed a pattern of attempting to force [her] out of the organization in order to make room for younger nurses."   Griffin argues that "Defendants were determined to force Plaintiff into training her replacement."

{¶ 20}   As this Court has previously noted:

A party against whom a claim for relief is asserted may move for a summary judgment as to all or part of the claim for relief asserted against him, and summary judgment must be rendered for the movant if the pleadings and evidentiary materials filed in the action show there is no genuine issue of material fact relevant to the claim for relief and that the moving party is entitled to judgment as a matter of law. The court must find that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in the party's favor. Civ.R. 56(C).   *Straley v. Garg*, 2d Dist. Clark No. 06CA0107,

2007-Ohio-2367, ¶ 16.

**{¶ 21}** As this Court has further previously noted:

When reviewing a trial court's grant of summary judgment, an appellate court conducts a de novo review. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). "De Novo review means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no genuine issues exist for trial." *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997), citing *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 119-120, 413 N.E.2d 1187 (1980). Therefore, the trial court's decision is not granted deference by the reviewing appellate court. *Brown v. Scioto Cty. Bd. Of Commrs.*, 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (4th Dist.1993).

*Powell v. Rion*, 2d Dist. Montgomery No. 24756, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6.

**{¶ 22}** R.C. 4112.02 provides: "It shall be an unlawful, discriminatory practice: (A) For any employer, because of the * * * age * * * of any person, to discharge without just cause, to refuse to rehire, or otherwise to discriminate against  that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."  R.C. 4112.99 provides: "Whoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief." R.C. 4112 et seq. "is the embodiment of Ohio's staunch resolve to remedy instances of discrimination based on 'race, color, religion sex, national origin, handicap, age, or ancestry

of any person.' R.C. 4112.02(A)." *Borad v. April Ents., Inc*., 2d Dist. Montgomery No. 25092, 2012-Ohio-5096, ¶ 10. "Because this statutory scheme is similar to federal discrimination law, '[f]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112.'" *Id*.

**{¶ 23}** As this Court noted in *Borad*, ¶ 12:

In *Byrnes v. LCI Communication Holdings Co.*, 77 Ohio St.3d 125, 128-129, 1996-Ohio-307, 672 N.E.2d 145, the Ohio Supreme Court stated that a plaintiff-employee may prove a claim of employer discrimination pursuant to R.C. 4112.02 via two separate methods.

Discriminatory intent may be established indirectly by the four-part analysis set forth in *Barker v. Scovill, Inc*., 6 Ohio St.3d 146, 451 N.E.2d 807 (1983), adopted from the standards established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct.1817, 36 L.Ed.2d 668 (1973). The *Barker* analysis requires that the plaintiff-employee demonstrate "(1) that he was a member of the statutorily-protected class, (2) that he was discharged, (3) that he was qualified for the position, and (4) that he was replaced by or that his discharge permitted the retention of a person not belonging to the protected class." *Id*., paragraph one of the syllabus. The fourth prong of this analysis has been broadened, allowing a plaintiff to show a substantially younger individual rather than an individual not belonging to the protected class. *Coryell v. Bank One Trust Co. N.A.,* 101 Ohio St.3d 175, 2004-Ohio-723,

803 N.E.2d 781, paragraph one of the syllabus.

{¶ 24} "[T]o prove a prima facie case of discrimination in the terms and conditions of employment, [a plaintiff] must demonstrate that the individuals outside of her class who were treated more favorably were similarly situated in all relevant respects." *Shepard v. Griffin Services, Inc.*, 2d Dist. Montgomery No. 19032, 2002-Ohio-2283, 2002 WL 940110, * 5. In the absence of such proof, "no inference of discrimination is raised." *Id*. "To be 'similarly situated,' the employees with whom the employee makes the comparison to establish disparate treatment 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Borad,* ¶ 17, quoting *Mitchell v. Toledo Hospital* (C.A. 6, 1992), 964 F.2d 577, 583.

{¶ 25} In the event the plaintiff establishes a prima facie case, "the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. * * * ." *Shepard*, *4. "However, the burden of persuasion remains at all times with the plaintiff. * * * The defendant need not persuade the court that its proffered reason was the only motivating factor in its decision, it must only raise a genuine issue of material fact that the decision was not motivated" by age. *Id*. "Once the employer states a nondiscriminatory reason for the action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the reason articulated by the defendant was mere pretext. * * *." *Id*.

{¶ 26} Finally, as this Court noted in *Borad, ¶* 13*:*

The second method to establish discriminatory intent * * * is through direct evidence of discrimination, "which is evidence other than the four-part demonstration of *Barker*. A plaintiff may establish a prima facie case by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent." (Internal citations omitted.) *Byrnes* at 128-129, 672 N.E.2d 145.

{¶ 27} "Direct evidence is 'evidence which, if believed, proves the existence of improper discrimination animus without inference or presumption.' * * * Evidence either of statements made by non-decision makers or of statements made by decision-makers that are not related to the decisional process itself do not satisfy the plaintiff's burden" of showing direct evidence of discriminatory intent. *Sheppard,* * 3. "Specifically, isolated or ambiguous discriminatory remarks are insufficient to support a claim for discrimination." *Id.,* * 4. "There must be a link or nexus between the discriminatory statement of conduct and the prohibited act of discrimination to establish a violation of the statute." *Byrnes,* at 130.

{¶ 28} We agree with Defendants' assertion that Boys' post-termination offer to allow Griffin to retire is not direct evidence that Defendants more likely than not were motivated by discriminatory intent in terminating and refusing to reinstate Griffin based on her age. We note that Skrlac testified that she and Truman made the decision to terminate Griffin, and Griffin testified that she was terminated by Truman and Skrlac. There is no link or nexus between Boys' offer of retirement and her refusal to reinstate Griffin that supports an inference that the refusal to reinstate Griffin was "the result of discriminatory

intent." Boys' isolated offer of retirement occurred after the decision to terminate Griffin had already been made by Skrlac and Truman (not Boys), and we cannot conclude that her offer "proves the existence of improper discrimination animus."

{¶ 29} Further, Griffin's reliance upon *Kohmescher* to support her argument that direct evidence of discriminatory treatment exists is misplaced. Therein, Kohmescher's employer decided to reduce its work force, and one of his superiors, Klocke, "proposed in a memorandum * * * that plaintiff's sales manager position be eliminated. The reason stated for selecting plaintiff's position for elimination was: '[p]erson eligible for retirement window.'" *Id*., at 501. Kohmescher was offered a transfer to an undisclosed location or retirement with enhanced benefits, and advised that he had to decide by the following day. *Id*., at 502. He chose to retire and then initiated suit, with his employer subsequently prevailing on summary judgment. *Id.* The court of appeals affirmed the decision of the trial court.

{¶ 30} In reversing the judgment of the court of appeals, the Supreme Court of Ohio determined as follows:

> We believe that plaintiff has presented what can be characterized as direct evidence of age discrimination sufficient to overcome Kroger's motion for summary judgment. Such direct evidence took the form of Klocke's written response to Kroger's request for implementation of its reduction in force ("RIF"). In recommending that plaintiff be selected for the RIF, Klocke clearly indicated that plaintiff was selected because he was "eligible for (the) retirement window." *Id*., at 504.

{¶ 31} Distinct from *Kohmescher*, in which a nexus exists between Klocke's recommendation and the termination of Kohmescher's employment, the evidence upon which Griffin relies does not establish that she was more likely than not terminated based upon her age, but rather that after her termination was accomplished, she was given the opportunity to retire. For the foregoing reasons, we conclude as a matter of law that Griffin has not presented direct evidence of age discrimination.

{¶ 32} Since direct evidence of discrimination based upon Griffin's age does not exist, we must next determine if Griffin has raised a genuine issue of material fact as to circumstantial evidence. It is undisputed that Griffin is a member of a statutorily protected class. *See* R.C. 4112.14 ("No employer shall discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee.") She was terminated, and refused reinstatement, and the record is clear that she was qualified for her position.

{¶ 33} Griffin has not demonstrated, however, that substantially younger nurses were treated more favorably than she was. In the lengthy list of examples in her brief of the disparate treatment she allegedly received, she fails to identify a single nurse for purposes of comparison who received more favorable treatment. Her deposition testimony is directed at the conduct and level of skill of the other nurses she mentions by name, and not their age. Griffin does not identify another employee not punished for theft of time, nor another employee similarly situated to her in all respects, including supervision by Skrlac. In fact,

she testified that she was "in kind of a unique position." In other words, Griffin failed to raise a genuine issue of material fact on the final element, and she accordingly cannot establish a prima facie case of discrimination in the terms and conditions of her employment. In other words, no inference of discrimination is raised.

{¶ 34} Having determined that Griffin failed to establish direct evidence, or raise an inference, of discrimination, our analysis concludes. There being no genuine issue for trial, Griffin's assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

FROELICH, J., concurring:

{¶ 35} The plaintiff contends that because of her age she was "set up to fail" by the defendant so that her position could be eliminated and its functions taken over by younger care providers. She asked the court basically to infer that since she was qualified for the team leader position and that she eventually (post termination) provided evidence she believed disproved any "theft" allegation, that the only possible reason (or, at least at the summary judgment phase, a plausible explanation that a jury could find) is that she was terminated because of her age.

{¶ 36} The plaintiff did not present any set of facts as to why the defendant would want to lose such an experienced and competent health care professional (e.g., her salary or benefits, a hospital-wide policy emphasizing "youth" and "newness", etc.). Or that the explanation of the defendant, at the time the termination decision was made, was a pretext.

{¶ 37} Plaintiff's theory could possibly correctly presume the unconscious or even

the concealed conscious motivation of the defendants. But, our duty is to correct any error made by the trial court, based on the record properly before the trial court. On this record, even construing all the evidence most favorable for the plaintiff, I concur with the majority.

· · · · · · · · · ·

Copies mailed to:

Russell A. Kelm
Joanne W. Detrick
Steven J. McCready
Samuel E. Dowse
Hon. Douglas M. Rastatter